William S. BORDEN, Jr., Trustee of Corpamerica, Inc. and Middlesex Trading Corporation, Debtors in Reorganization under Chapter X of the Bankruptcy Act, Appellant in No. 75–1274,

v.

R. Abbott SINSKEY and Minna Sinskey, Appellants in No. 75–1256.

Nos. 75–1256, 75–1274.

United States Court of Appeals, Third Circuit.

Argued Sept. 19, 1975.

Decided Jan. 19, 1976.

Rehearing and Rehearing En Banc Denied March 3, 1976.

Rosenn, Circuit Judge, filed an opinion concurring in part and dissenting in part.

480

Burton Peskin, Jamieson, Walsh, McCardell, Moore & Peskin, Trenton, N. J., and H. Albert Young, Edward B. Maxwell, 2nd, Jack B. Jacobs, Young,

Conaway, Stargatt & Taylor, Wilmington, Del., for William S. Borden, Jr., Trustee.

Victor F. Battaglia, Biggs & Battaglia, Samuel R. Russell, Wilmington, Del., for appellants, R. Abbott Sinskey and Minna Sinskey.

Before SEITZ, Chief Judge, ROSENN and GARTH, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Chief Judge.

Plaintiff, William S. Borden, trustee in reorganization of Corpamerica, Inc. ("Corpamerica") and Middlesex Trading Corporation ("Middlesex"), brought this action against the defendants, R. Abbott and Minna Sinskey, husband and wife, charging them with conversion of corporate assets, usurpation of corporate opportunities and violations of Rule 10b–5, 17 C.F.R. § 240.10b–5 (1974), in connection with a series of bank acquisitions carried out by the defendants. The district court dismissed the Rule 10b–5 claim, but found that the defendants had breached certain fiduciary obligations owed by them to both Corpamerica and Middlesex. Consequently, it awarded plaintiff money damages and imposed a constructive trust on certain bank stocks owned by the defendants. The defendants appeal from this judgment, while the plaintiff cross appeals from the dismissal of his Rule 10b–5 claim.[1]

## I. THE PARTIES

### A. Corpamerica:

Corpamerica is a Delaware corporation which was formed in 1950 by defendant R. Abbott Sinskey for the purpose of buying and holding bank stocks and bank-related assets, including the controlling interest in banks. Sinskey placed it into reorganization in 1967 to halt a derivative suit brought by a former director. At the time of the present action, Corpamerica had no assets other than its claims against the defendants.

Since its creation, Corpamerica has had two classes of stock outstanding:

---

1. In view of our disposition of this appeal on the state law issues, we have found it unnecessary to express an opinion on plaintiff's Rule 10b–5 claim.

"Class A", a non-voting "investment" stock with dividend and liquidation preference rights, and "Class B", a voting stock paying no dividends and subordinated on liquidation. The "Class A" stock of which there are approximately 23,000 shares outstanding, is publicly held by shareholders who have invested approximately $340,000 in Corpamerica. Neither of the defendants owns any "Class A" shares. On the other hand, all of the 10,000 shares of "Class B" stock are held by defendant Minna Sinskey. These shares were originally issued to her for a total investment of $1,000, and, since that time, have been owned exclusively by either her or her husband. Consequently, the Sinskeys have always exercised control over Corpamerica.

The Sinskeys' control is reflected in the composition of Corpamerica's management. From Corpamerica's creation until the institution of reorganization proceedings in 1967, R. Abbott Sinskey served as both president and a director of the corporation. The remainder of Corpamerica's three man board of directors has always, with a single exception, consisted of close personal friends and/or business associates of the Sinskeys.

### B. *Middlesex Trading:*

Middlesex, a New Jersey corporation, was formed by R. Abbott Sinskey in 1960 for the limited purpose of purchasing, and then reselling, the minority stock interest in Perth Amboy National Bank ("Perth Amboy"), Perth Amboy, New Jersey, the controlling interest of which Sinskey was then in the process of acquiring. Throughout its existence, Middlesex has never been more than a mere instrumentality of both Corpamerica and the Sinskeys. This domination was assured by their control of Middlesex's corporate board which has always

consisted of individuals intimately connected with Corpamerica. R. Abbott Sinskey himself became president and a director of Middlesex in 1963, and, from that time forward, the boards of both Corpamerica and Middlesex were identical. So were their fates. Like Corpamerica, Middlesex was placed into Chapter X reorganization by Sinskey in early 1967; like Corpamerica it had no assets other than its claims against the Sinskeys at the outset of this litigation.[2]

### C. *R. Abbott and Minna Sinskey:*

As already noted, R. Abbott Sinskey founded both Corpamerica and Middlesex, and also served both corporations as a president and director. From 1950 until 1966, he served in the same capacities at Colonial National Bank ("Colonial"), Wilmington, Delaware, the controlling stock of which was owned by his wife Minna. In addition, Sinskey himself was the controlling stockholder in the following banks: Perth Amboy, of which he was also president and a member of the board (1961–present); First National Bank of Carteret ("Carteret"), Carteret, New Jersey, of which he was also a director (1955–61); and Edgewater National Bank ("Edgewater"), Edgewater, New Jersey, for which he also served as president (1959–66).

Minna Sinskey never actively participated in the management of either Corpamerica or Colonial despite her controlling interests in those entities. Rather, she placed her control at the disposal of her husband, thus enabling him to embark on his course of bank acquisitions.[3]

At the outset, we find it necessary to comment briefly on the potential liability of Minna Sinskey as this issue pervades the entire opinion, yet remains largely hidden from view because of her husband's domination of the events giving

---

**2.** The district court found defendants liable to Middlesex for all funds they borrowed from it, the costs of placing it into reorganization, the rental payments made by it on their Park Avenue apartment, and the losses sustained by it in connection with the Perth Amboy transaction. On appeal, appellants raise no specific objections to this portion of the district court's opinion. However, we assume that they ex-

pect to be exonerated of at least their liability for Middlesex's losses on the Perth Amboy transaction if this Court finds they violated no fiduciary obligations in making the challenged bank acquisitions.

**3.** Since R. Abbott Sinskey was the primary actor in the challenged transactions, all references hereinafter to "Sinskey" will be to him unless otherwise indicated.

rise to this litigation. The court below imposed joint and several liability on both Minna Sinskey and her husband. Defendants challenge this determination with respect to Minna Sinskey contending that she was guilty of no misconduct whatsoever. Instead, as the district court found, she was totally dominated by her husband and merely followed his directions in all financial matters. Hence, they assert that there is absolutely no evidence in the record on which to predicate her liability.

We, however, cannot agree that her generally passive role in the matters complained of necessarily exonerates her of all liability in this case. It is undisputed that she placed all of her business affairs, including the management of her controlling interests in both Corpamerica and Colonial, in the hands of her husband. Under the circumstances, we believe that she thus authorized him to act as her general business agent. Indeed, she herself characterized their relationship in matters financial as one of agency.

It is alleged, in substance, that her husband defrauded Corpamerica and Middlesex while exercising the power she had placed at his disposal and that the fruits of his misconduct inured to their mutual benefit. Hence, under familiar principles of agency, so long as he was acting within the scope of his authority, she would be fully liable for any fraud committed by him in the course of managing her business affairs. Moreover, this liability would exist even if his fraud was committed without her knowledge, consent or participation. See *In re Brandywine Volkswagen Ltd.*, 306 A.2d 24 (Del.Super.1973), *aff'd sub nom. Brandywine Volkswagen, Ltd. v. State, Dept. of Consumer Affairs*, 312 A.2d 632 (Del. Supr.1973).

In addition, we note that she did in fact admit participation in the challenged transactions, albeit at her husband's direction. In particular, she personally signed notes, guaranteed indebtedness, and pledged her Colonial stock as security for loans. These acts were essential to the success of her husband's alleged schemes to defraud both Corpamerica and Middlesex. Consequently, we believe that if the district court correctly found R. Abbott Sinskey guilty of misconduct in acquiring the banking opportunities for himself, it was fully justified in imposing liability on Minna Sinskey as well, especially since the plaintiff-trustee seeks only the return of assets, and the benefits derived therefrom, which were allegedly diverted wrongfully from both Corpamerica and Middlesex.

## II. THE FACTUAL BACKGROUND

Plaintiff brought this action in 1968 against the Sinskeys alleging that they had violated their fiduciary obligations toward Corpamerica and Middlesex by usurping certain corporate opportunities rightfully belonging to Corpamerica and otherwise converting assets of each corporation to their own use. Plaintiff's charges stem from a series of bank acquisitions and bank related transactions carried out by R. Abbott Sinskey during his tenure as a director and officer of both Corpamerica and Middlesex. From 1955 to 1961, Sinskey acquired for himself control over the Carteret, Perth Amboy and Edgewater banks. In addition, at the time of the Perth Amboy transaction, Sinskey had his wife enter into an executory agreement with Corpamerica purporting to sell to it her controlling stock in Colonial National Bank. Plaintiff claims the Sinskeys' interests in each of these banks (or the profits derived from their sale) as assets of Corpamerica.

Although the various transactions giving rise to plaintiff's allegations of fiduciary wrongdoing are exceedingly complex, the district court comprehensively described them in its opinion below. Therefore, rather than chronicling them in detail once again, we will only summarize each transaction in this section of our opinion. A more detailed treatment of the facts will follow where relevant to our disposition of the issues raised on appeal.

### A. *Carteret:*

In early September 1955, Sinskey learned that the control stock of the

First National Bank of Carteret was available for a total purchase price of $165,000. After a discussion with his fellow Corpamerica directors, it was apparently decided that Corpamerica would ultimately purchase the Carteret stock, but that Sinskey would take title to it in the interim. On September 6, Sinskey began negotiations with the seller. An agreement naming "Corpamerica, its nominees and/or assigns" as purchaser was drawn up the same day. By October 7, the sale was completed, and, three days later, Sinskey took title to the stock as planned. The transaction was structured in the following manner: At the time of the agreement's execution, Corpamerica made an initial downpayment of $88,000; on October 7, it issued the seller 1,200 shares of its "Class A" stock valued at $30,000; and, on the same day, Sinskey paid the $47,000 balance yet due of the $165,000 purchase price.

Although Sinskey's $47,000 payment completed the transaction from the seller's point of view, Corpamerica and Sinskey continued to exchange funds. On October 10, Sinskey received $75,000 from Corpamerica. He then obtained a $200,000 loan secured by the newly-acquired Carteret stock and his wife's holdings in Colonial National Bank. With the proceeds of this loan, he repaid Corpamerica $118,000, representing the corporation's downpayment and the value of its stock that had been issued to the seller. This payment left Corpamerica and Sinskey with investments in Carteret of $75,000 and $90,000, respectively.

As the transaction allegedly envisioned Corpamerica's ultimate control of Carteret, Sinskey presented the corporation with an option to purchase the Carteret stock at the same price paid by him. Under the terms of the option, Sinskey was entitled to retain control of all the Carteret stock until he received payment in full from Corpamerica. By February 1956, Corpamerica had made additional payments of $80,000 to Sinskey giving it a total investment in the Carteret stock of $155,000. However, Sinskey never permitted Corpamerica to discharge the balance of the option price. As a result, Corpamerica never received title to a single share of Carteret stock. The option was finally cancelled in 1960 when an option to purchase the controlling stock in the merged Carteret-Perth Amboy bank was substituted in its place. This option, too, was later cancelled.

Although Sinskey's net investment in Carteret totalled only $10,000 while Corpamerica's totalled $155,000, all benefits from the acquisition ultimately inured to Sinskey personally. From 1956 until 1962 (the time of the Carteret-Perth Amboy merger), he exercised personal control over the bank. During this same period he received dividends and director's fees totalling $17,285, none of which was ever turned over to Corpamerica.

### B. Edgewater:

In June 1959, Sinskey acquired for himself the controlling stock interest in the Edgewater National Bank at a total purchase price of $428,043. At that time, Corpamerica, through Sinskey, was actively seeking bank acquisitions. In spite of his activities on Corpamerica's behalf, Sinskey neither advised Corpamerica of, nor offered it, the opportunity to purchase the Edgewater stock, although it does appear that his fellow directors were aware of the transaction. Sinskey retained his Edgewater stock until 1966 when he sold it for $750,000.

No Corpamerica funds were apparently used in the initial purchase. Instead, Sinskey financed the transaction with two loans: (1) a $205,000 loan secured by his wife's Colonial stock and, quite possibly, the Carteret stock under option to Corpamerica; (2) a $223,040 loan secured by the Edgewater stock itself. However, $200,000 paid by Corpamerica to Sinskey in connection with the Perth Amboy transaction, infra, was used by him to liquidate the latter loan and free the Edgewater stock.

The Edgewater transaction proved extremely profitable to Sinskey. From 1959 until his disposition of the stock in 1966, he received dividends and salaries from Edgewater in the amount of $193,-469.86. In addition, he realized a profit of approximately $250,000 on his sale of the Edgewater stock.

### C. *Perth Amboy:*

In April 1960, Sinskey discovered that nearly all of the outstanding stock in Perth Amboy National Bank was available for purchase in a single block. Perth Amboy, by Sinskey's own testimony, represented an "excellent deal" for Corpamerica as well as an excellent candidate for merger with the Carteret bank. In addition Sinskey admitted that Corpamerica had expressed an interest in purchasing Perth Amboy and that it possessed an "expectancy" in the bank in the event financing could be arranged. However, once again, he purchased the controlling interest for himself; once again, Corpamerica was left with an option to purchase his interest, this time in the merged Carteret-Perth Amboy bank. This option, too, was eventually cancelled.

The transaction proposed by Sinskey, and ratified by Corpamerica's board, was as follows: The entire block of Perth Amboy stock would be purchased for approximately $65.00 per share with the intention of merging Perth Amboy and Carteret. Sinskey himself would buy the controlling interest for approximately $50.00 per share ($630,000). The minority interest would be purchased for approximately $80.00 per share ($695,360) by a broker who would then resell it to the public following the contemplated merger. To secure Corpamerica's interest in the transaction, its earlier option to purchase Sinskey's Carteret stock would be cancelled and an option to purchase his control interest in the merged Carteret-Perth Amboy bank for $1,165,000 substituted in its place.[4] The consideration for this new option was set at $355,000—a credit for the amount already paid Sinskey in connection with the Carteret stock, and an additional $200,000 in new money.

Sinskey's plan encountered an immediate obstacle when he could find no broker to underwrite the sale of the minority interest. Consequently, Middlesex was formed by him for this purpose. However, even though Middlesex would take title to the minority stock interest, Corpamerica ultimately agreed to assume any gains or losses on its resale.[5]

Except for this change, the transaction went forward as planned. In early May, Corpamerica's Carteret option was cancelled and replaced by the option in the merged banks. Sinskey received from Corpamerica the consideration for the new option in two $100,000 installments—the first in May, the second in July. Sinskey ultimately discharged his earlier loan secured by the Edgewater stock with these funds. However, the initial installment was first used by him as a deposit on the Perth Amboy purchase until financing was arranged.

The Perth Amboy acquisition itself occurred in July 1960 with Sinskey purchasing the control stock and Middlesex the minority. Each purchase was financed 100%. Both Sinskey and his wife signed the loan financing the control stock purchase. The loan for the minority stock was signed on Middlesex's behalf by Sinskey and guaranteed by both him and his wife in their individual capacities. Although the two loans were independent of one another, they were apparently secured by the same collateral—the Sinskeys' stock interests in Carteret, Perth Amboy, Edgewater, and Colonial.

With the acquisition of Perth Amboy successfully completed, Sinskey embarked on the second phase of his plan—the merger between Carteret and Perth Amboy. In this regard, he filed a merger application with the Comptroller of the Currency. However, this initial application was rejected in December 1960. Shortly thereafter, Sinskey met with the Deputy Comptroller hoping to obtain a reversal of this decision. This attempt, too, proved unsuccessful. However, the Deputy Comptroller did advise Sinskey that his application would receive favorable consideration in the event a

---

4. In the event this option had been exercised, Sinskey would have realized a gross profit of approximately $370,000.

5. A loss on resale was virtually assured by the disparity between the prices paid by Sinskey for the majority interest and Middlesex for the minority. It eventually totalled $27,130.

strengthening of Perth Amboy's management and a clear record of operation over a reasonable period of time occurred.

Although both the Deputy Comptroller's statements and his own subsequent actions seem to indicate otherwise, Sinskey testified that he believed the planned merger to be a "dead issue" in January 1961. Consequently, Corpamerica's option to purchase control of the merged banks was cancelled at a meeting of its directors held that month. The cancellation, of course, left Sinskey with a personal obligation to Corpamerica in the amount of $355,000, the price paid by Corpamerica for the now-cancelled option. However, rather than discharging this debt, which was by his own statement then "due and payable", he had his wife enter into an executory agreement with Corpamerica purporting to sell it her control stock in the Colonial National Bank for approximately that amount.

Despite his alleged belief that it was a dead issue, Sinskey continued his efforts to effectuate the merger between Carteret and Perth Amboy after the cancellation of the option. These efforts were ultimately rewarded when a second merger application was approved by the Comptroller in August 1962.

Like the earlier transactions, the Perth Amboy acquisition advanced only the personal interests of R. Abbott Sinskey. In addition to placing him in control of Perth Amboy, and eventually the merged Carteret-Perth Amboy institution, his stock ownership produced more than $750,000 in dividends. Moreover, as a director and the chief executive officer of the bank he received fees and salaries totalling nearly $375,000. Corpamerica, on the other hand, found its goal of acquiring a bank frustrated once again by Sinskey's actions. Despite its interest in both Carteret and Perth Amboy, it was left with only an executory agreement to purchase Colonial, an agreement to which we now turn.

### D. *Colonial:*

Although Corpamerica allegedly entered into the contract to purchase Minna Sinskey's Colonial control stock in January 1961, the contract itself was not recorded in its corporate minutes until nearly a year later. The agreement purported to sell Corpamerica Minna Sinskey's interest for $347,907.20. Any balance of the $355,000 already paid her husband for the cancelled Carteret-Perth Amboy option yet remaining at the time of the contract's performance was to be credited against this amount. Settlement on the contract was to occur on or before January 31, 1967.

However, the contract, dictated by Sinskey, conditioned the sale on the fulfillment of certain stipulations.[6] The district court determined that these conditions rendered the agreement totally illusory and unenforceable against Sinskey. He was thus enabled to honor the contract or ignore it depending on its profitability to him at the settlement date. Sinskey contends, however, that these conditions had been satisfied by 1967 and that only the derivative suit which led to the reorganization of both Corpamerica and Middlesex prevented the consummation of the sale.

The above events led the district court to the conclusion that fiduciary obligations had been violated to "an extra-ordinary degree" and it therefore entered judgment for the plaintiff on his state law claims.[7] More specifically, the court below held that Carteret, Edgewater, and Perth Amboy were corporate opportunities rightfully belonging to Corpamerica. Consequently, it imposed a constructive trust in favor of the plaintiff on Sinskey's stock in the merged Carteret-Perth Amboy bank. In addition, plaintiff was awarded a money judg-

---

**6.** The conditions, established by Sinskey, were as follows: (1) that the bank have or develop top management; (2) that the bank continue its development and growth; (3) that a downtown Wilmington branch be pressed for, opened, and successfully functioning; and (4) that the members of the bank staff with long years of service be protected.

**7.** We are convinced that the judgment entered against the defendants reflects the district court's view that the fruits of the misconduct inured to their mutual benefit.

ment encompassing, among other things, the profit Sinskey derived on his disposition of the Edgewater stock as well as all salaries, director's fees and dividends received by him in connection with the above banks. The defendants were granted credits against this amount for all of their proven personal expenditures in acquiring the banks. Finally, the court ordered specific performance of the Colonial contract, imposing a constructive trust on Minna Sinskey's control stock. The $347,000 contract price would be offset against the money judgment at the time the defendants turned over the Colonial stock to the plaintiff.

On appeal, the defendants have launched a wide-ranging attack on the decision of the district court. Their contentions will be discussed *seriatim* below.

## III. ISSUES ON APPEAL

A. *Statute of Limitations and Laches:*

The district court held that Delaware's three year statute of limitations,[8] 10 Del.C. § 8106, did not bar plaintiff's claims with respect to the Carteret, Edgewater, and Perth Amboy transactions even though each had occurred more than three years prior to February 6, 1967, the date on which Corpamerica's reorganization petition was filed.[9] Two alternate grounds formed the basis for this conclusion. First, the court reasoned that laches, rather than the statute of limitations, governed the timeliness of this suit under the doctrine first enunciated in *Bovay v. H. M. Byllesby & Co.,* 27 Del.Ch. 381, 38 A.2d 808 (Del. Supr.1944). It then went on to find that the plaintiff's diligence in bringing this action after learning of his claims negated the presence of laches in this case. Second, the court held that even if the statute of limitations were applicable,

the defendants' "fraudulent concealment" of the cause of action prevented it from operating as a bar to plaintiff's claims. On appeal, the defendants raise a number of objections to these determinations.

■ The defendants first contend that the *Bovay* exception to Delaware's statute of limitations has no application to the instant case. Under this exception, corporate officers and directors are denied the defense of the statute of limitations when, by their fraudulent self-dealing, they have benefited at the expense of their corporation. Relying on *Halpern v. Barran,* 313 A.2d 139 (Del.Ch. 1973), defendants argue that before the *Bovay* exception places an action beyond the coverage of the statute there must be allegations of fraudulent self-dealing on the part of a corporate fiduciary. Since the district court, while finding self-dealing on Sinskey's part, made no specific finding as to the essential element of fraud, they maintain that its reliance on *Bovay* to suspend the statute's operation was misplaced.

Although the district court may not have specifically stated that Sinskey engaged in fraudulent self-dealing, we feel that it nevertheless found the fraudulent misconduct essential to render *Bovay* applicable. While discussing this issue in *Mayer v. Adams,* 40 Del.Ch. 94, 174 A.2d 313, 316 (1961), the Delaware Supreme Court queried: "Does the amended complaint charge fraud of the kind found in the Byllesby case, i.e., *a case in which directors profit financially at the expense of their corporation.*" (emphasis added). The court thus equated the requisite fraud with self-dealing on the part of a corporate fiduciary that results in his personal gain to the detriment of his corporation.

---

**8.** The statute of limitations posed a potential bar only to the plaintiff-trustee's claims that the defendants had usurped corporate opportunities of Corpamerica, a Delaware corporation. Hence, the district court applied the Delaware, rather than the New Jersey, statute of limitations even though this action was brought in the district of New Jersey and Middlesex is a New Jersey corporation. The defendants assign no error to this choice of law.

**9.** This date was determined to be critical for limitations purposes because the Bankruptcy Act authorizes a trustee to institute legal proceedings within two years following the filing of the reorganization petition to enforce claims of the debtor which were not barred by the relevant state or federal statute of limitations at the time the petition was filed. 11 U.S.C. § 29(e).

Although *Halpern,* upon which defendants rely, does state that allegations of fraudulent self-dealing are required before *Bovay* may be invoked, its discussion of *Bovay* and its progeny makes clear that the applicability of the exception turns on the presence of profiteering by corporate fiduciaries at the expense of the corporation. Moreover, the court there refused to utilize *Bovay* for precisely that reason:

> "Plaintiffs here have not alleged that any of the individual defendants personally profited from breaches of fiduciary duty . . . . Therefore the exception to the statute of limitations expressed in *Bovay* does not apply to them." 313 A.2d at 143.

By contrast, in the instant case, not only did plaintiff's complaint allege, but also the district court specifically found, that Sinskey derived personal profits from his manipulation of Corpamerica in violation of his fiduciary obligations. Consequently, we find no error in the district court's decision to apply *Bovay* and disregard the statute of limitations.

The equitable doctrine of laches provides a defense to a cause of action when a plaintiff unreasonably delays in bringing suit after learning of his claims, and this delay results in prejudice to a defendant. *Federal United Corp. v. Havender,* 24 Del.Ch. 318, 11 A.2d 331 (Del. Supr.1940). Applying this doctrine, the district court held that the plaintiff had brought suit with reasonable diligence following his appointment as trustee in 1967, and that any possible prejudice to the Sinskeys resulted, not from any dilatory tactics on plaintiff's part, but from the complex nature of this litigation.

▉ Defendants raise two objections to this determination. First, defendants' briefs seem to suggest that the timeliness of this suit should be judged from the accrual of the particular causes of action, rather than the date of the trustee's appointment. Under Delaware law a cause of action accrues when both the cause of action and parties capable of suing and being sued are in existence. *Keller v. Farmers Bank,* 2 Terry 471, 24 A.2d 539 (Del.Supr.1942). Defendants argue that these requisites were fulfilled with respect to the challenged Carteret, Edgewater and Perth Amboy transactions over a period running from September 1955 to July 1960. Hence, they say, the delay in bringing suit was at least seven years longer than the district court determined. Second, defendants assert that this delay in bringing suit prejudiced them because two of Corpamerica's original directors, Young and Huntington, died in 1957 and 1962, respectively, and were, therefore, unavailable to testify on the crucial issue of their domination by Sinskey.

Once again, we find no merit in defendants' position. Certainly, if the court correctly focused on the actions of the plaintiff trustee, no amount of diligence on his part could have prevented the alleged prejudice to defendants as the deaths of Young and Huntington occurred long before his appointment in 1967. Moreover, even assuming that the particular causes of action accrued at the times defendants allege, laches would not bar plaintiff's claims for it does not run from the mere accrual of a cause of action but from the date a plaintiff learns, or should have learned, of the existence of the cause of action. *Moser v. Moser,* 287 A.2d 398 (Del.Supr.1972); *Cahall v. Burbage,* 13 Del.Ch. 299, 119 A. 574 (Del.Ch.1922). Here, the district court found that defendants effectively concealed the claims plaintiff now asserts until long after the deaths of Young and Huntington.[10] Hence, any

---

10. Nor is this finding of concealment unsupported by the record, as defendants suggest, because Max Kay, a Corpamerica director and "Class A" shareholder, knew of the transactions and because the details of all the acquisitions, but Edgewater, were recorded in Corpamerica's minutes. As he passively ratified Sinskey's acquisition of the banks for himself while he was on the board, Kay was a poten-

tial defendant in any derivative suit challenging Sinskey's actions. His knowledge, then, cannot be imputed to Corpamerica's other "Class A" shareholders so as to bar this action. Likewise, the "Class A" shareholders had no constructive knowledge of the causes of action merely because Sinskey disclosed the acquisitions in Corpamerica's minutes. Shareholders have no duty to search a corporation's

prejudice suffered by defendants from the loss of the decedents' testimony is not attributable to plaintiff.

Finally, we fail to see how the alleged delay in bringing this suit resulted in any prejudice whatsoever to the defendants. If, as defendants assert, the Carteret cause of action accrued for limitations purposes in September 1955, a suit based upon it and governed by Delaware's three year statute of limitations could have been brought until September 1958, approximately one year after the death of Young. Likewise, Huntington's death in 1961 predated the expiration of the limitations periods for the Edgewater and Perth Amboy transactions by approximately one and two years, respectively. Consequently, defendants could have been called upon to defend the Edgewater and Perth Amboy transactions without the testimony of either director, while, in a suit brought within the applicable time period challenging the Carteret acquisition, they would have been assured of only Huntington's appearance. We therefore concur in the district court's determination that laches did not bar this action due to the absence of both the unreasonable delay and resultant prejudice essential to that defense.

We note a final point on the statute of limitations issue. The Delaware courts have not yet applied the *Bovay* exception to a controlling shareholder such as Minna Sinskey. However, a number of cases have assumed without deciding that it does extend to those who fraudulently exercise their control over a corporation in violation of their limited fiduciary obligations. *E.g., Halpern, supra.* We believe that a Delaware court, confronted with the facts of the instant case, would not hesitate to find that the equitable exception would operate to deny her the benefit of the statute of limitations. As already pointed out, her personal interests were advanced at the expense of both Corpamerica and its other shareholders by her husband's fraudulent use of the power she placed at his disposal. In addition, she took a somewhat active role in his fraudulent schemes to divert Corpamerica's assets to their own use by personally guaranteeing the loans he used to acquire the banks as well as providing much of the collateral needed to obtain them. We therefore hold that the *Bovay* exception precludes Minna Sinskey from asserting the statute of limitations as a defense to the instant action.

In view of our treatment of the laches question, we find it unnecessary to express an opinion on the fraudulent concealment issue.

**B. *Corporate Opportunities:***

Applying the doctrine first announced in *Guth v. Loft*, 23 Del.Ch. 255, 5 A.2d 503 (Del.Supr.1939), the court below held that the Carteret, Edgewater, and Perth Amboy banks constituted "corporate opportunities" that belonged in all fairness to Corpamerica.[11] Defendants challenge this determination on two grounds. First, they assert that the facts and circumstances of the instant case do not support the existence of any "corporate opportunities". Second, they contend that even if Carteret and Perth Amboy were correctly found to be "corporate opportunities", Sinskey's personal acquisition of them should be beyond challenge as a "disinterested" Corpamerica board both authorized and approved his actions in an exercise of its business judgment. Defendants make no similar claim with respect to Edgewater.

Briefly stated, the doctrine of "corporate opportunity" precludes a corporate fiduciary from acquiring for himself a business opportunity that his

---

records for evidence of misconduct on the part of corporate officers and directors. Rather, they are entitled to assume that those standing in a fiduciary relationship to them will be faithful to their charge. *Cahall v. Burbage, supra.*

11. Since the district court found the doctrine of corporate opportunity to be substantially the same in both Delaware and New Jersey, it limited its treatment of the subject to Delaware precedents. We do not hesitate to do likewise particularly since the defendants assign no error to this approach and the issues on appeal predominately concern Corpamerica, a Delaware corporation.

"corporation is financially able to undertake, and which, by its nature, falls into the line of the corporation's business and is of practical advantage to it, or is an opportunity in which the corporation has an actual or expectant interest."

 *Equity Corp. v. Milton*, 221 A.2d 494, 497 (Del.Supr.1966). Whether or not a given opportunity meets these requisites is largely a question of fact to be determined from the objective facts and surrounding circumstances existing at the time the opportunity arises. *Equity Corp., supra; Guth, supra.* If these elements are found to be present, the opportunity is treated as a corporate asset and the corporate officer's or director's illicit diversion of it to his own use constitutes a violation of his fiduciary duty.

Defendants attack the court's application of this doctrine to the facts of the instant case on a rather narrow basis. No objection is raised to the court's determination that bank acquisitions fell within Corpamerica's line of business. Nor is there dissent to its finding that each acquisition would have been to Corpamerica's practical advantage. Rather, defendants limit their assignments of error to the court's conclusions: (a) that Corpamerica possessed the financial ability to undertake each opportunity as it arose, and (b) that several federal and state banking laws posed no insurmountable barriers to Corpamerica's acquisition of the banks in its own right. They assert that it was the existence of such financial and legal obstacles, rather than any actions on Sinskey's part, that prevented Corpamerica from purchasing Carteret, Edgewater and Perth Amboy. They conclude that these barriers, present then, now preclude a finding that Sinskey usurped "corporate opportunities" of Corpamerica.

 We will consider each transaction individually in light of both contentions. Defendants' first argument contests the factual findings of a court sitting without a jury, and thus our review will be limited to determining whether the court's finding of financial ability was clearly erroneous. The banking law question raises legal issues calling for complete consideration of the soundness of the district court's ruling.

*Carteret:*

Defendants' conclusion that Corpamerica was both financially and legally unable to avail itself of the Carteret opportunity is based on the following rationale. First, they assert that Corpamerica lacked the $165,000, needed to consummate the Carteret acquisition in October 1955. At the time, Corpamerica, they contend, had only the $75,000 it initially invested in Carteret available for that purpose due to other pressing financial commitments. The fulfillment of these obligations left Corpamerica with a cash balance of only $44,800 at the month's close. Since this amount was obviously insufficient to discharge the additional $90,000 of the $165,000 purchase price, Corpamerica could not have undertaken the Carteret opportunity on its own as the district court determined.

Second, they maintain that even if Corpamerica had had sufficient resources at its disposal to acquire the Carteret stock, in doing so it would have depleted its readily marketable assets below the minimum level required to obtain a voting permit by § 19(b)[12] of the Banking Act of 1933, 48 Stat. 186. Consequently, in purchasing control of Carteret, Corpamerica would have legally disabled itself from exercising that control. These financial and legal obstacles, defendants assert, prevented Careret from ever becoming a "corporate opportunity".

On the issue of financial ability, the record amply supports the district court's conclusion. At the very least, it indicates that Corpamerica had adequate resources to acquire the Carteret stock as of October 7, the date of the settlement of the contract. By that date, Corpamerica had made a cash downpayment and issued stock to the seller in the amount of $118,000. Only three days later, it paid Sinskey an additional $75,000 in

---

**12.** Since superseded by 12 U.S.C. § 61.

connection with the Carteret option. Thus, simple arithmetic demonstrates that during the pertinent period Corpamerica's cash and assets exceeded the $165,000 purchase price.

Moreover, even accepting defendants' contention of the limited availability of investment funds, we see no reason why Corpamerica could not have raised the additional $90,000 needed through a loan secured by the Carteret stock. Sinskey himself obtained most of the funds used in the transaction by doing just that. Defendants contend that Corpamerica lacked Sinskey's borrowing power. They point out that Sinskey pledged *both* the Carteret and Colonial stock to secure his loan. However, Sinskey used both stocks as collateral on a $200,000 loan; Corpamerica needed only $90,000. Certainly, a pledge of the Carteret stock alone would have enabled it to borrow this lesser amount. In this regard, we note also that Sinskey himself stated time and time again on cross-examination that Corpamerica would have experienced no difficulty in obtaining any financing that it needed.

Finally, regardless of the feasibility of its acquiring the Carteret stock in October, Corpamerica certainly possessed the financial ability to exercise its option to purchase that stock shortly thereafter. Within five months, it had paid Sinskey $155,000 of the $165,000 option price. Defendants do not, and cannot, contest Corpamerica's capacity to discharge the $10,000 balance that remained. We find no error in the district court's conclusion that Corpamerica had sufficient resources to avail itself of the opportunity.

Defendants next argue that § 19(b) of the Banking Act of 1933 effectively precluded Corpamerica from taking advantage of the Carteret opportunity. That provision required a "holding company affiliate" such as Corpamerica to possess, free and clear of all encumbrances, readily marketable assets in an amount equal to at least 12% of the aggregate par value of all bank stocks it controlled in order to obtain a voting permit enabling it to vote its stock. No similar restriction was placed on an individual. Defendants assert that Corpamerica could

not have met this requirement. Since the aggregate par value of the Carteret stock was $54,800, Corpamerica would have needed readily marketable assets totalling $7,008 if it wished to exercise its control over Carteret. However, an additional outlay of $90,000 in October 1955 would have totally exhausted its cash reserves of $44,800 and left it in a deficit position. Hence, defendants conclude that § 19(b) demanded that Sinskey, rather than Corpamerica, take title to the Carteret stock.

There are three answers to defendants' argument. First, even assuming that § 19(b) would have prevented Corpamerica from voting its Carteret stock, it posed no obstacle whatsoever to Corpamerica's acquisition of that stock. That provision specifically contemplated that "holding company affiliates" would control bank stocks that they could not vote. Moreover, it permitted such entities to vote on matters pertaining to voluntary liquidation whether they possessed a voting permit or not. Since § 19(b) did not therefore preclude Corpamerica from taking title to the Carteret stock, we do not believe that it was the type of legal barrier that would prevent Carteret from exercising such an opportunity.

Second, even if Corpamerica was initially unable to obtain a voting permit, it could have acquired one in the near future. Sinskey himself admitted that Corpamerica could have fulfilled all of the issuance preconditions but the assets requirement, in this case $7,008. Certainly, this minimal figure was readily attainable by Corpamerica. A temporary disability of this nature can hardly justify Sinskey's acquisition and retention of the Carteret stock for himself.

Finally, we see no reason why Corpamerica could not have immediately satisfied the requirements of § 19(b). Defendants' argument erroneously assumes that Corpamerica would have had to exhaust its cash reserves in acquiring Carteret. However, as already noted, Corpamerica could have borrowed the $90,000 it needed to complete the trans-

action using the Carteret stock as collateral. If it had done so, it would have retained its entire cash balance of $44,800, an amount more than six times greater than that required by § 19(b). Consequently, we find no error in the district court's conclusion that Carteret constituted a "corporate opportunity" of Corpamerica.

*Edgewater:*

With respect to Edgewater, defendants voice similar objections to the conclusion of the district court that Corpamerica possessed the financial and legal capacity to undertake the opportunity on its own. Specifically, they maintain: (1) that, contrary to the district court's finding, the $428,043 purchase price of the Edgewater stock was completely beyond Corpamerica's means at the time the opportunity arose in June 1959; and (2) that, regardless of Corpamerica's financial ability to acquire the Edgewater stock, certain provisions of the Bank Holding Company Act of 1956, 12 U.S.C. § 1841, *et seq.*, and New Jersey's Holding Company Law, N.J.S.A. § 17:9A–345, absolutely prohibited it from doing so.

On the issue of financial capacity, the district court determined that Corpamerica had available to it two sources which would have provided it with sufficient capital to acquire the Edgewater stock. It found that Corpamerica could have raised approximately one-half of the $428,043 purchase price by selling the Carteret stock which rightfully belonged to it. The balance, it concluded, could have been obtained through a loan secured by the Edgewater stock itself. In addition, the court reasoned that the fact that Sinskey himself had been actively seeking bank acquisitions on Corpamerica's behalf at the time of the Edgewater transaction indicated that financing would have posed no real obstacle. Consequently, Edgewater, in its opinion, was a business opportunity that Corpamerica had the financial ability to undertake.

Once again, we are unable to conclude that this determination was clearly erroneous. We have already noted our agreement with the district court's conclusion that the Carteret stock was an asset of Corpamerica. The record indicates that, at the time of the Edgewater transaction, this stock was worth in excess of $200,000. For example, in 1957 Sinskey received a tentative offer to purchase the Carteret stock for $225,000. Moreover, Sinskey himself valued it at $250,000 on a personal financial statement issued by him in 1960. Hence, a sale of that stock in order to obtain a portion of the Edgewater purchase price was certainly an option available to Corpamerica if it desired to pursue the opportunity.

We also see no reason why Corpamerica could not have financed the remainder of the transaction through a pledge of the Edgewater stock. Sinskey himself raised more than 50% of the purchase price in just this fashion. Defendants, however, argue once again that it is erroneous to assume that Corpamerica could have borrowed funds as freely as Sinskey. Instead, they assert that only his personal borrowing power, which he was under no duty to exercise on Corpamerica's behalf, made the transaction possible. Quite possibly, Corpamerica would have been unable to finance the transaction 100% as Sinskey did. However, it would not have had to borrow the entire purchase price, but only approximately 50% of it, had it not been deprived of its opportunity to acquire the Carteret stock. Surely, a pledge of collateral worth more than twice the needed $200,000 would have enabled Corpamerica to borrow that amount, especially in light of the fact that it could then have exhibited to a prospective lender a favorable balance sheet indicating a net worth in excess of $285,000.

Nor do we find error in the district court's determination that the supposed legal "barriers" cited by defendants would not have prevented Corpamerica from taking advantage of the Edgewater opportunity. Both the federal and state holding company laws relied on by defendants apply only to an entity that owns at least 25% of the voting stock of one or more banks when it seeks further bank acquisitions. To be sure, such laws would have precluded Corpamerica from

acquiring the Edgewater stock if it then controlled Carteret and wished to retain that control. However, we must evaluate an alleged corporate opportunity in light of the facts and circumstances existing at the time it arises. And at the time the Edgewater stock became available, Corpamerica did not own 25% of the voting stock of any bank due to Sinskey's violations of his fiduciary obligations. Moreover, even if it had controlled Carteret at that time, it could have avoided any problems with the bank holding company laws by simply selling its Carteret stock. Consequently, we agree that Edgewater was a corporate opportunity of Corpamerica.

*Perth Amboy:*

The defendants make the same arguments regarding Corpamerica's financial and legal incapacity to undertake the Perth Amboy opportunity as they did with respect to Edgewater. In doing so, they appear to ask this court to evaluate the acquisition of the Perth Amboy bank independently of the total scheme devised by Sinskey to place the merged Carteret-Perth Amboy institution under Corpamerica's control. Viewing the transaction in this fashion, they seem to suggest, demonstrates the fallacy of the district court's conclusion that Perth Amboy constituted a corporate opportunity of Corpamerica.

The court below, however, refused to take such a narrow view of the transaction. Instead, it treated Corpamerica's interest in the merged institution as the corporate opportunity usurped by Sinskey. It noted that Sinskey designed the complex acquisition stratagem to avoid any legal and financial obstacles to Corpamerica's ultimate control of the Carteret-Perth Amboy bank. Since a good faith implementation of the scheme would have eliminated the legal and financial disabilities now pointed to by defendants, it refused to allow them to rely on such alleged problems as proof that the opportunity was never corporate in nature.

We find no error in the district court's refusal to consider the Perth Amboy acquisition outside the context of the entire merger scheme. The record readily demonstrates that its acquisition was only the first step towards the ultimate goal of the transaction—Corpamerica's control of the merged Carteret-Perth Amboy bank. Neither Corpamerica nor Sinskey had any particular interest in Perth Amboy alone. Rather, it was the merged institution that, as Sinskey testified, made the transaction the "perfect setup" and "a good deal and an excellent opportunity for Corpamerica".

When the scheme is viewed in its entirety, it becomes apparent that the alleged financial obstacles cited by defendants were nonexistent. As originally envisioned, the transaction called for Corpamerica to purchase Perth Amboy while retaining its Carteret option. It would then effectuate a merger between the two banks. Sinskey himself testified that financing such an arrangement "would not have been very difficult" in light of the planned merger for the resulting entity would have been a "very excellent banking institution". This original plan was only abandoned, and the option scheme substituted in its place, when it became evident that Corpamerica's retention of both the Carteret option and the Perth Amboy stock prior to the merger might violate the federal and state bank holding company laws. However, we see no reason why Corpamerica would have experienced any more difficulty in financing the acquisition of the merged Carteret-Perth Amboy stock pursuant to its option than it would have in purchasing the Perth Amboy stock alone. In either instance, a prospective lender would have ultimately looked to Corpamerica's stock in the merged institution as the major security for his loan.

The option scheme itself further demonstrates that financing was not the major obstacle that defendants now claim it would have been. The option's terms called for Corpamerica to pay Sinskey approximately $300,000 more than he expended in acquiring the control stocks in both Carteret and Perth Amboy. Obviously, defendants must have believed Corpamerica had sufficient resources available to it in order to exercise this

option, if, as they assert, the plan was only designed to assure Corpamerica's ultimate control of the merged institution. Otherwise, they are left in the unenviable position of arguing that they extracted funds from Corpamerica for an option that they were fully aware it lacked the financial ability to utilize. In addition, we note that financial considerations did not enter into the decision to cancel Corpamerica's option as we might expect if financing was, in reality, an insurmountable obstacle. Rather, defendants maintain that it was motivated by Sinskey's conviction that the planned merger was a "dead letter", a conviction that his own subsequent actions belie.

Admittedly, Corpamerica's financial ability to avail itself of the opportunity was conditioned on the use, to some extent, of Sinskey's own borrowing power and resources. To be sure, he was under no obligation to pledge his personal credit and assets on Corpamerica's behalf. However, he did in fact make such a commitment in designing, and then embarking, on this plan of acquisition with Corpamerica allegedly as the ultimate beneficiary. Having done so, he could not abandon Corpamerica in order to further his own self-interest and then point to its resultant financial disability as evidence that it was unable to pursue the Perth Amboy opportunity on its own accord.

Moreover, we note that Sinskey himself would have been unable to undertake the Perth Amboy opportunity if he did not have at his disposal the assets which he wrongfully diverted from Corpamerica. The $200,000 he extracted from Corpamerica for the option he now claims it lacked the financial ability to exercise was first used by him as a downpayment on the Perth Amboy transaction. Later, when financing was arranged, these same funds discharged Sinskey's earlier loan secured by the Edgewater stock. This stock was then pledged by him along with the Carteret,

Colonial and Perth Amboy stocks as collateral for the loan used to make the Perth Amboy acquisition. Of these four stocks, only Colonial rightfully belonged to the Sinskeys; the remainder were, or should have been, assets of Corpamerica.[13] In addition, Sinskey manipulated the purchase price of the entire block of Perth Amboy stock so that he could acquire the controlling interest for $50.00 a share while Middlesex paid $80.00 a share for the minority stock which it was to offer to the public. He then had Corpamerica assume the inevitable losses on that resale. It is thus evident that Sinskey's own ability to acquire Perth Amboy depended on the use of assets and funds which he had diverted from Corpamerica to himself in violation of his fiduciary obligations. Under circumstances such as these, he cannot be permitted to retain the Perth Amboy stock for himself.

Much the same can be said for the alleged legal obstacles to Corpamerica's purchase of the Perth Amboy control stock. Had Sinskey carried out the plan of acquisition in good faith, Corpamerica would have been in full compliance with the provisions of the federal and state bank holding company laws cited by defendants. Indeed, the option scheme was specifically designed by Sinskey to avoid any difficulties with these provisions. Consequently, defendants cannot now rely on any disabilities resulting from Sinskey's abandonment of the plan as a defense to Corpamerica's claims. We therefore agree with the district court that Perth Amboy constituted a corporate opportunity of Corpamerica.

*Business Judgment Rule:*

Finally, defendants seek to justify Sinskey's personal acquisition and retention of the Carteret and Perth Amboy banks on the ground that a disinterested Corpamerica board of directors had full knowledge of his actions and ap-

---

**13.** It is irrelevant that Corpamerica, unlike Sinskey, would not have had the Carteret stock available to it to use in this transaction if it had sold that stock in order to purchase Edgewater, as we hypothesized earlier. We refuse to speculate as to what financing options might have been available to Corpamerica had Sinskey not previously deprived it of the Carteret and Edgewater opportunities.

proved them in an exercise of its business judgment. The district court, however, refused to evaluate the transactions under the business judgment rule. Instead, finding that Sinskey had both dominated Corpamerica's board and engaged in self-dealing in making the acquisitions for himself, it placed the burden on defendants to demonstrate the "intrinsic fairness" of each transaction to Corpamerica.[14] This, they failed to do.

On appeal, defendants make no effort to contest the district court's determination that the Carteret and Perth Amboy acquisitions were "unfair" to Corpamerica. Nor could they on the facts of the instant case. Rather, they confine their challenge to the court's decision to review each transaction under the stringent standards of the "intrinsic fairness" doctrine, rather than the business judgment rule. The application of this doctrine was error, they assert, for the plaintiff-trustee failed to establish, as a matter of law, a pre-condition to its use—an "interested" or "dominated" board. Such a finding, they maintain, requires a showing that board members have a financial interest in the outcome of a particular transaction. Since no evidence on this point was produced, the district court erred in applying the "intrinsic fairness" doctrine to the instant case.

Our examination of the relevant Delaware case law indicates that the issue of director "interest" or "domination" is largely a question of fact to be determined from all the relevant facts and circumstances of a particular case. *Puma v. Marriot*, 283 A.2d 693 (Del.Ch. 1971); *Greene v. Allen*, 35 Del.Ch. 242, 114 A.2d 916 (Del.Ch.1955), *rev'd on other grounds*, 121 A.2d 919 (Del.Ch.1956). While a showing of financial interest is certainly relevant to, and often dispositive of, this question, it is only one factor to be considered by the finder of fact.

Viewing the issue in this fashion, we cannot disturb the decision of the district court despite the absence of a financial motive on the part of Sinskey's fellow Corpamerica directors. A careful review of the record indicates ample support for its conclusion that "Sinskey's domination of Corpamerica . . . was total, uninterrupted and unchallenged." Consequently, we find no error in its refusal to attach any significance to the "ratification" of Sinskey's actions by Corpamerica's board.

### C. *Specific Performance of the Colonial Contract:*

■ Despite its illusory nature, the district court held that defendants were estopped from denying the enforceability of the contract by which Minna Sinskey sold her Colonial control stock to Corpamerica. Consequently, it ordered specific performance of the agreement. In doing so, it granted defendants a credit against the money judgment rendered against them in the amount of the $347,-907.20 purchase price.

On appeal, defendants raise no challenge to the enforceability of the contract. In fact, they concede that Corpamerica is entitled to the Colonial stock by virtue of the contract. However, this concession is conditioned upon their retention of both the stock in the merged Carteret-Perth Amboy bank and the proceeds derived from the sale of the Edgewater stock. They base this claim on the following rationale. They maintain that the Colonial contract, as the district court found, was given "in exchange" for the cancellation of Corpamerica's option to purchase the controlling interest in the Carteret-Perth Amboy institution. Thus, the option's cancellation formed part of the consideration for the Colonial agreement. Since the Carteret, Perth Amboy and Edgewater stocks were all tied up in that option, Corpamerica relin-

---

14. In applying the "intrinsic fairness" doctrine in this context, we assume that the district court required defendants to demonstrate that an independent board would have foregone the opportunity in "good faith", i. e., that their decision was motivated only by the merits of each particular transaction, and not in any manner by Sinskey's interest therein. See *Greene v. Allen*, 35 Del.Ch. 242, 114 A.2d 916 (Del.Ch.1955), *rev'd on other grounds*, 121 A.2d 919 (Del.Supr.1956).

quished all claims to them in accepting the Colonial contract. Consequently, if that contract is to be performed, so must this aspect of the bargain.

There are two answers to defendants' argument. In the first place, the cancellation of Corpamerica's option was not, as defendants contend, a condition of the Colonial agreement. The contract, which is contained in Corpamerica's minutes and purports to be the "full agreement" between the parties, makes no mention whatsoever of the option. It only sets forth the purchase price, that any monies yet owed Corpamerica by Sinskey at the time of the contract's settlement would be offset against that price, and the pre-conditions to the contract's closing. Nor do we read the district court's opinion to find otherwise. Although it does state that the contract was given "in exchange" and "in place" of the option, it does so in the limited context of depicting the events giving rise to the agreement. We believe that it was then only describing the *occasion* for the contract, and not its contents. When the court eventually recites the terms of the agreement, no reference at all is made to the cancellation of the option.

In any event, we would not permit defendants to legitimize their violations of fiduciary obligation in this fashion. In cancelling Corpamerica's option, Sinskey finalized his usurpations of the Carteret, Edgewater, and Perth Amboy opportunities. Moreover, by that time he had already extracted $355,000 from Corpamerica for options which he now claims that it never possessed the financial or legal capacity to exercise. He now attempts to place his acquisition of these items beyond challenge by offering Corpamerica the Colonial stock, which carried a book value at the date of the contract of less than the $347,000 purchase price. There is a fatal flaw in this argument. Sinskey cannot be permitted to retain the fruits of his misconduct through an agreement of this nature. A corporate fiduciary who violates his duty of loyalty is stripped of all profits and benefits derived therefrom. *Guth v. Loft,* 23 Del.Ch. 255, 5 A.2d at 513; *Eq-*

*uity Corporation v. Milton, supra.* To hold otherwise would allow Sinskey to easily evade the consequences of his wrongdoing and undermine the strong deterrent rationale of this rule.

### D. *Attack on the Form of Relief Granted:*

Defendants raise a number of objections to the form of relief granted the plaintiff-trustee by the district court. Specifically, they maintain that the district court erred in: (1) failing to order a general accounting after trial to determine the proper amount of credits due defendants for their personal expenditures in undertaking the challenged transactions; (2) failing to order an accounting to determine the reasonable value of the services Sinskey rendered as a corporate officer and/or director of the Carteret, Edgewater and Perth Amboy banks; (3) enjoining the sale of the Sinskeys' Renoir painting and Park Avenue Apartment; and (4) imposing a constructive trust in favor of the plaintiff-trustee on both the Carteret-Perth Amboy and Colonial banks.

*Failure to Order an Accounting:*

Following decision, but prior to judgment, counsel for defendants moved the court pursuant to Federal Rule of Civil Procedure 53 to refer the case to a master for an accounting in order to determine the proper amount of credits and setoffs due defendants by virtue of their personal expenditures in acquiring the bank stocks. This motion was denied. Defendants now contend that the district court erred in doing so for it thereby subjected them to a "double liability", i. e., by divesting them of all interest in the stocks while failing to compensate them for the monies expended in acquiring them. Moreover, they maintain that the district court, by stating in its opinion that defendants would be granted credits for all their "proven" expenditures in acquiring Perth Amboy and Edgewater and initially ordering an accounting to determine the dollar value of the Carteret-Perth Amboy stock, misled them into believing that a general

accounting on the issue of damages would be held. The opinion, they argue, thereby induced them to withhold evidence on this issue at trial.

Our review of the record, however, does not indicate that the district court committed any error in refusing to refer this matter to a master for further fact-finding on the issue of damages. Defendants had ample notice that the amount of damages was an issue to be determined at trial. The district court specifically listed it as such in its pre-trial order. Moreover, defendants themselves represented that they would offer evidence on this point in their pre-trial memorandum.

Second, in their Rule 53 motion, defendants offered no satisfactory explanation for their failure to produce evidence on the issue of credits at trial. On appeal, however, they now suggest that the district court's opinion misled them into withholding this evidence by indicating that a general accounting would determine the issue of damages. How the court's opinion, filed long after the trial, could have had this effect we find difficult to comprehend.

In any event, any reliance by defendants on the district court's opinion would have been misplaced. The opinion only orders an accounting to determine the dollar value of the Carteret-Perth Amboy stock; it does not order that further evidence on the issue of credits be taken. At that time, the court was interested in the stock's value for it held the erroneous impression that the Bank Holding Company Act of 1956 precluded the plaintiff-trustee from taking title to the stock in both the Colonial and Carteret-Perth Amboy banks. Consequently, it had decided to award him the value of the Carteret-Perth Amboy stock, rather than the stock itself. The only credits to be offset against that figure were those expenditures *already proven* by the defendants at trial. Hence, the accounting became unnecessary when the court concluded that the plaintiff could legally hold the controlling stock in both banks and it was cancelled. Likewise, only the Sinskeys' *proven* expenditures were to be credited against the proceeds of the Edgewater transaction.

One final note on this issue is in order. The district court did grant defendants more than $430,000 in credits. The "double liability" argument put forward by defendants thus loses much of its superficial appeal. We therefore find no error in the district court's refusal to appoint a master in this case.

*Reasonable Value of Sinskey's Services:*

■ Applying the rule of *Guth v. Loft, supra,* the district court held that Corpamerica was entitled to all salaries received by Sinskey as a director and/or officer of Carteret, Edgewater, and Perth Amboy. Defendants contend that the district court erred in so doing. They say that even if Sinskey could not retain those salaries, he should have been awarded the reasonable value of the services rendered. To support this claim, they attempt to distinguish the facts of the instant case from those in *Guth* on the ground that only the salaries received by Guth from Pepsi-Cola while he was "a full time president of Loft at an attractive salary" were turned over to Loft by the court. Here, Sinskey, unlike Guth, received only a nominal salary from Corpamerica. Consequently, they assert that it is inequitable to require Sinskey to turn over the full amount of his salaries without offering him any compensation for the valuable services he performed. Defendants then ask this Court to order an accounting to determine the reasonable value of such services.

Since defendants' claim is, in essence, one for credits, we might find that their failure to offer evidence on this issue at trial is fatal. However, even if we were now to order an accounting, we would not permit Sinskey to retain the reasonable value of his services. Although defendants may be able to distinguish the facts of *Guth* from those of the instant case, they cannot distinguish away the rationale of that decision. The court there did not order Guth to pay over all the salaries he received from Pepsi-Cola while serving as Loft's chief executive because Loft had fairly compensated him

during that period. Rather, they were stripped away because Guth had gained them through his usurpation of the Pepsi-Cola opportunity in violation of his fiduciary duties. The court refused to allow him to retain any of the profits or benefits derived from his misconduct in order to deter any disloyalty on the part of a corporate fiduciary. As the court stated:

> "If an officer or director of a corporation, in violation of his duty as such, acquires gain or advantage for himself, the law charges the interest so acquired with a trust for the benefit of the corporation, . . . while *it denies to the betrayer all benefit and profit.* The rule, inveterate and uncompromising in its rigidity, does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, *but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation."* 5 A.2d at 510 (emphasis added).

We, therefore, find no error in the order of the district court directing Sinskey to pay Corpamerica all salaries received from Carteret, Perth Amboy and Edgewater.

### The Sinskeys' Park Avenue Apartment and Renoir Painting:

■ In its final judgment and order, the district court continued in full force and effect its injunction *pendente lite* preventing the Sinskeys from disposing of their Park Avenue apartment and Renoir painting without first obtaining the court's permission. Defendants now challenge this action, contending that the district court's failure to make any findings with respect to those assets in its opinion precluded it from continuing the injunction.

The plaintiff originally laid claim to these items when he learned that Sinskey had acquired them during the course of the proceedings through a loan secured by the Carteret-Perth Amboy stock. He then moved the court to enjoin the Sinskeys' disposition of them pending the outcome of the trial on the ground that if the Carteret-Perth Amboy stock was found to be an asset of Corpamerica, it would be entitled to these items in compensation for the impairment of that asset. The court below agreed with plaintiff and granted his motion. Consequently, when he ultimately prevailed on his claim with respect to the Carteret-Perth Amboy stock at trial, the district court appropriately continued the earlier injunction in its final order since that was the basis of its issuance. We find no error.

### Imposition of the Constructive Trusts:

■ Originally, the district court interpreted § 3(d) of the Bank Holding Company Act, 12 U.S.C. § 1842(d), which precludes a "bank holding company" from acquiring the controlling interests in banks located in different states, to prohibit the plaintiff-trustee from taking title to the Sinskeys' stock in both Carteret-Perth Amboy and Colonial. However, after hearing argument from plaintiff's counsel to which the defendants failed to respond, and considering a letter submitted by the Federal Reserve Board on this point, it reversed its initial position and concluded that the plaintiff-trustee, as an individual, was exempt from the Act's coverage. Consequently, it imposed both the constructive trusts sought by the appellee. On appeal, defendants contend that the court erred in finding that the Act had no application on the ground that the plaintiff-trustee represents Corpamerica, which is clearly subject to the Act's proscriptions, and should, therefore, be considered a "bank holding company" within the meaning of the Act.

Although the district court was confronted with a novel issue, we find no error in its treatment of the problem. Under a strict view of the statute, the district court was certainly correct since title to the stocks in question would not vest in Corpamerica, but in its trustee in Chapter X reorganization. And as an individual, he is excluded from the Act's coverage. 12 U.S.C. § 1841(b).

However, we need not rest our decision on such a literal interpretation of the statute. Our examination of the relevant legislative history fails to disclose any reason in policy or logic for depriving the plaintiff-trustee of his status as an individual merely because he represents Corpamerica's interests. Individuals were and are excluded from the Act's operation because, unlike corporations, they have a finite existence and, therefore, cannot exercise control over a bank in perpetuity. *See 1956 U.S.Code Cong. & Admin.News* at p. 2488. Certainly, the plaintiff-trustee will not hold the stocks he takes in "perpetuity" since his power extends only for the duration of the Chapter X reorganization proceeding. Nor is there any danger that the plaintiff-trustee will act as a "monopolist"—a second evil to which the Act is directed. Hence, we feel that the relief granted by the district court was fully consistent with the policy of the Act.

In any event, we fail to see how the district court's decision to impose constructive trusts as a remedy for the defendants' misconduct affects their interests in any manner. We have already determined that both the Colonial and Carteret-Perth Amboy stocks belonged in all fairness to Corpamerica. Hence, an order imposing a constructive trust over both stocks in favor of the plaintiff-trustee was certainly appropriate. The fact that federal and state banking laws may require him to dispose of the stock in order to effectuate a plan of reorganization does not alter the defendants' duty to return the assets to their rightful owner. Moreover, since the plaintiff-trustee is under the strict supervision of the bankruptcy court, we are confident that any final reorganization plan will be in full compliance with all relevant state and federal banking laws.

The judgment of the district court will be affirmed.

ROSENN, Circuit Judge (concurring and dissenting).

I fully concur with the majority in their painstaking analysis and in their imposition of liability as to the defendant R. Abbott Sinskey. I also agree that Minna Sinskey obligated herself on the note to Middlesex Corporation, and I have no difficulty in affirming the judgment against her on that obligation. In addition, the majority have properly affirmed the judgment of the district court ordering specific performance of a contract which Mrs. Sinskey executed for the sale of her stock in Colonial National Bank and imposing a constructive trust upon that stock. The point at which we diverge and where I dissent is the imposition of liability generally upon Minna Sinskey.

Although Mr. Sinskey's conduct and machinations warrant the full weight of the judgment awarded against him by the district court, I do not believe we may properly transfer any of the onus of his misconduct to his wife without evidence of her knowing participation in the fraudulent schemes. "One who innocently . . . does an act which furthers the tortious purpose of another is not acting in concert with him." *Prosser, Torts* 292 (4th ed. 1971).

The district court found that, although Mrs. Sinskey owned the controlling interest in Colonial National Bank and in Corpamerica, she "took no active role in either entity." She relied upon her husband's advice in all business matters; in that regard, she did precisely what he told her to do. It is uncontroverted that she never discussed business with him. She was neither a director nor an officer of any of the corporations.

The majority charge Mrs. Sinskey with "participation in the challenged transactions, albeit at her husband's direction," by guaranteeing loans her husband used to acquire banks. I do not believe that merely signing a note to accommodate her husband, guaranteeing loans, and turning over stock as collateral for the loans, without other evidence that she at least knew that the loans were to further her husband's fraudulent plans or schemes, is sufficient to make Minna Sinskey an active participant.

The majority portray Mrs. Sinskey's role as that of a principal who constituted her husband her general business

agent. If that is an accurate characterization of their relationship with respect to Mrs. Sinskey's business affairs, it nonetheless does nor per se clothe Mr. Sinskey with authority to act as her agent for all purposes, especially as to an illegal or improper purpose. Authority given to Mr. Sinskey by his wife to act as her agent in managing her business affairs does not authorize her husband to fraudulently divert corporate opportunities on his or her behalf. "[E]ven a general authority is not an unlimited one." *Arthur Jordan Piano Co. v. Lewis,* 4 W.W.Harr., 423, 154 A. 467, 472 (Del.Super.1930). A principal is usually liable only for those acts of his agent which are performed within the scope of the agent's authority. Restatement (Second) of Agency § 265 (1958).

Mr. Sinskey's misconduct was in his personal dealings with Corpamerica and Middlesex. When he negotiated purchases of stock which rightfully belonged to Corpamerica, he was acting not as agent for Minna Sinskey but for his own individual account. It is significant that Mr. Sinskey acquired the stock in the various banks in his own name. It may be that he was able to take advantage of these opportunities with credit that was made available to him on notes signed by Minna Sinskey and on her guarantees. However, Mrs. Sinskey's signature to notes as an accommodation for her husband does not make him her agent; on the contrary, it is evidence that Mr. Sinskey was using his wife's credit to accomplish his own personal ends.

In *Dick v. Reves,* 206 A.2d 671 (Del. 1965), the Delaware Supreme Court refused to uphold the liability of a husband for misrepresentations made in the sale of his wife's property by his wife's father. Liability was sought on the basis that he had signed the deed with his wife in order to release his "husband's rights" in her property in Pennsylvania. The court stated:

> [The husband] never gave any actual authority to Mr. Jones [the father-in-law]. There is no proof of ·apparent authority; the plaintiffs were never told that Jones was acting for Mr.

Dick. There is no evidence that he had any actual knowledge of the misrepresentation. He received no part of the consideration.

*Id.* at 675. The principle which emerged from the case is that a mere signature which may or may not be necessary to the execution of a fraudulent scheme is insufficient, without more, to hold the signer liable for damages. In the instant case, Mrs. Sinskey did not even sign any of the underlying agreements by which the banks were acquired. On this record, she merely served as an innocent tool by which her husband borrowed money—money, it is true, which enabled him to make the bank purchases.

I believe *In re Brandywine Volkswagen Ltd.,* 306 A.2d 24 (Del.Super. 1973), *aff'd,* 312 A.2d 632 (Del.1973), which is cited by the majority, is inapposite here. As I read that case, it merely holds that a principal may be liable for the innocent misrepresentation of its agent when the principal has received information of which the agent is ignorant. In the instant case, however, the person designated as "principal" was innocent and uninformed; it was the "agent" who acted knowingly and wrongfully. I agree that if Mrs. Sinskey personally derived benefits from her husband's wrongful acts, she may not retain the benefits thus obtained. *Dick v. Reves, supra,* 206 A.2d at 675.

I would therefore reverse the judgment of the district court only insofar as it imposes liability generally upon Mrs. Sinskey. In all other respects I concur with the majority.