The Equity Corporation, Plaintiff Below,
Appellant,

and

Eugene Casey,
Intervening Plaintiff,

*vs.*

David M. Milton and Triangle Securities Corporation,
Defendants Below,
Appellees.

*Supreme Court, On Appeal, June 16, 1966.*

*Richard F. Corroon* and *Hugh L. Corroon,* of Berl, Potter & Anderson, Wilmington, and *Richard Wait* and *Mark A. Michelson,* of Choate, Hall & Stewart, Boston, Mass., for appellants.

*John Van Brunt, Jr.,* of Killoran & Van Brunt, Wilmington, and *Milton V. Freeman* and *Werner J. Kronstein,* of Arnold & Porter, Washington, D. C., for appellees.

WOLCOTT, C. J., and CAREY and HERRMANN, JJ., sitting.

WOLCOTT, Chief Justice: This is an appeal from an order of the Court of Chancery entering a summary judgment in favor of both defendants.

The plaintiff, The Equity Corporation, a closed-end investment company, brought suit against David M. Milton, Chief Executive Officer and Chairman of the Board of Equity, and his wholly-owned subsidiary, Triangle Securities Corporation.

The suit seeks to compel Milton to account or to turn over to Equity options to purchase 1,773,665 shares of Equity common stock representing about 20% of its outstanding stock. Equity charges that Milton obtained the options under circumstances which Equity says was the taking to himself of a corporate opportunity which be-

longed to Equity. The corporate opportunity is stated to be that it is of benefit to Equity, an investment company, to have large blocks of its own stock available for use in making exchange offers to acquire investments.

The circumstances are that, since 1935, Milton has been the Chief Executive Officer of Equity, and is currently the Chairman of its Board. Since 1933 Milton, through a series of interlocking foreign corporations, controlled Darien Continental Corporation, a Panamanian corporation, which held title to approximately 20% of the outstanding common stock of Equity. It is an undisputed fact that from approximately 1933 to 1962 Milton was in undisputed control through the medium of the interlocking foreign corporations of this 20% block of Equity stock. He also had a large beneficial interest in this block of stock.

In 1962 changes were made in the Federal tax laws. Milton's tax counsel advised him that these changes made the holding of his interest in Equity by interlocking foreign corporations subject to adverse tax consequences. Accordingly, commencing in November, 1962, Milton, by reason of his control, caused Darien, the Panamanian corporation holding the Equity shares, to commence sales of the Equity stock held by it to various U. S. citizens and entities. In connection with each sale Darien obtained a "put and call" option under which, at any time, the shares could have been reacquired at prices ranging from $3.00 to $3.50. However, Darien, prior to December 31, 1962, was able to dispose in this way of approximately only half of its holding of Equity stock.

In December, 1962, Milton disposed of his interest in the balance of the block of Equity shares held by Darien by causing the sale of stock of Oceanic Trading Corporation, a Panamanian corporation, owning 100% of Darien to a Swiss corporation, MET Verwaltungs-Aktiengesellschaft. Upon the consummation of the sale of Oceanic stock to MET, Milton advised Equity of the transaction.

Since, under Swiss law, MET was prohibited from disclosing the identity of its stockholders, the Securities and Exchange Commission complained to Equity of this fact and it became apparent that the continued control by the Swiss corporation of a block of Equity shares

would cause increasing difficulties. Counsel for Equity thereupon urged Milton to negotiate for the removal of MET as a major stockholder of Equity.

Pursuant to this urging, Milton arranged to have his wholly-owned subsidiary, Triangle Securities Corporation, a Delaware corporation, acquire from Darien "put and call" options to substantially the same block of Equity shares which he, Milton, had controlled through the various foreign corporations prior to December, 1962. Upon the consummation of the acquisition by Triangle of the "put and call" options, Milton informed the Equity officers and directors, practically contemporaneously, of the acquisition of these options, the subject matter of this litigation.

On September 7, 1963, in a proxy statement mailed to all Equity stockholders, full disclosure was made by Equity of this transaction. In May, 1964, at an Equity stockholders meeting, counsel for Eugene Casey, the intervening plaintiff herein, informally inquired concerning the acquisition of the options and, in September, 1964, Casey made demand on the directors that steps be taken to acquire the options in question by Equity.

The foregoing statement of facts are taken primarily from the two affidavits of Milton. The plaintiffs filed the affidavits of Walter C. Ivancevic and Frederick W. Jaqua, a former President and Vice President of Equity, in opposition to the defendant's motions for summary judgment. The opposing affidavits, however, do not dispute the accuracy of the facts alleged by Milton and recited above. The counter affidavits do taken exception to certain other factual statements made in the Milton affidavits to which reference will be made later.

The action was instituted by Equity. It is disputed between the parties as to whether or not the action was initiated at the suggestion of Milton to end, one way or the other, the controversy which had arisen by reason of the existence of the options under his control, or whether, as the plaintiffs contend, it was initiated on the Equity directors' own initiative. Whichever is the case, however, it is immaterial to a decision of this cause.

Following the filing of the action, Casey, the second largest stockholder of Equity, was permitted to intervene as a party-plaintiff on

the ground that he desired to see that the action was vigorously prosecuted against Milton. The burden, however, of going forward with the action has been accepted and discharged by Equity.

The theory of the complaint is that a corporate opportunity, *viz.,* the acquisition of the options in question, was presented to Milton as an officer of Equity and that he took it for his own benefit, whereas he should have accepted it in behalf of the corporation to which he owed a fiduciary duty.

■ The law as to corporate opportunity is settled in this State by two decisions of this Court, *Guth v. Loft, Inc.,* 23 *Del.Ch.* 255, 269, 5 *A.2d* 503, and *Johnston v. Greene,* 35 *Del.Ch.* 479, 121 *A.2d* 919. The rule of the *Guth* case is that when there is presented to a corporate officer a business opportunity which the corporation is financially able to undertake, and which, by its nature, falls into the line of the corporation's business and is of practical advantage to it, or is an opportunity in which the corporation has an actual or expectant interest, the officer is prohibited from permitting his self-interest to be brought into conflict with the corporation's interest and may not take the opportunity for himself.

■ A corollary of the *Guth* rule is that when a business opportunity comes to a corporate officer, which, because of the nature of the opportunity, is not one which is essential or desirable for his corporation to embrace, being an opportunity in which it has no actual or expectant interest, the officer is entitled to treat the business opportunity as his own and the corporation has no interest in it, provided the officer has not wrongfully embarked the corporation's resources in order to acquire the business opportunity.

■ We reaffirmed this basic rule in the *Johnston* case and posed the question to be determined in all such instances to be whether or not the director has appropriated something for himself that, in all fairness, should belong to his corporation. The determination of this question is always one of fact to be determined from the objective facts and surrounding circumstances.

The plaintiffs' argument as to corporate opportunity is that § 23 of the Investment Company Act requires investment companies to receive for their own stock, when issued or transferred in return for other assets, the equivalent of its net asset value. Since the net asset

value of Equity stock is approximately twice that of these option prices, the plaintiffs say that it is an obvious advantage to Equity to acquire its own stock at half the price of its asset value since it may then use these shares priced at their asset value in exchange for the acquisition of investments.

Theoretically, it would seem as though the plaintiffs are correct, but as a practical matter it seems obvious to us as a matter of common sense that no one is going to exchange assets for Equity stock valued at its net asset value when that value is approximately twice the amount required to buy Equity shares on the open market. The argument seems to fly in the face of common financial judgment.

This being so, we think a necessary element of the corporate opportunity rule is missing in this case. That is the element that the opportunity is one of practical advantage to the corporation of which the defendant is an officer.

A second and equally important element of the rule of corporate opportunity is that the opportunity, itself, must fit into the business of the corporation or fit into an established corporate policy which the acquisition of the opportunity would forward.

We think the plaintiffs have wholly failed to establish that there has ever been a corporate policy established for Equity to acquire a large block of its own shares of this type. The only thing pointed to in the plaintiffs' affidavits is that Equity, over the course of a few years, announced to its stockholders that it intended to buy Equity shares on the market as seemed convenient to the directors of Equity at the time. In point of fact, such purchases over the years 1950 to 1964 varied from a high of 18,605 shares in 1950 to a low of 272 shares in 1953, with no purchases being made for some of the years in question. This history, we think, falls far short of establishing for Equity a corporate policy to acquire large numbers of its shares for the purpose of the acquisition of other investments by exchange.

Equally important is the fact that the papers before us contain no instance of Equity ever acquiring an investment through an exchange of its own shares. As a matter of fact, in Equity's proxy statement of April, 1962, the directors submitted to the stockholders, who ap-

proved the recommendation, a proposal to retire in excess of 700,000 shares of Equity's common stock acquired in return for a distribution of shares of another corporation. If Equity had the policy plaintiffs say it had, the question may be legitimately asked as to why these shares were retired rather than kept for purposes of exchange.

The plaintiffs deny that no exchanges of Equity stock have been made to acquire assets and point to a transaction involving the acquisition by Equity of Equity shares in exchange for stock of Friden, Inc. This transaction occurred in the year 1961. In that year Equity exchanged 62,357 Friden shares representing a part of Equity's investment portfolio for 748,284 shares of its own stock. This transaction, however, was the reverse of what the plaintiffs contend since, in effect, Equity distributed a portion of its assets in exchange for its stock. It acquired no new investments. It was this Equity stock which was retired in 1962.

The plaintiffs point next to a proposed exchange of the Singer Company stock held in Equity's portfolio at a ratio of one share of Singer for 18 shares of Equity as establishing a corporate policy of acquisition of Equity shares. This seems, however, not to have been the fact since the purpose of this proposed transaction was to give Equity stockholders a direct participation in the Singer shares, and to secure for Equity some tax advantage. As a matter of fact, the Singer proposal died a-borning. Certain other instances pointed to by the plaintiffs fall within the same category and were not in reality primarily the acquisition by Equity of its own stock for the ultimate acquisition of new investments, but were required for tax or other unrelated corporate purposes.

The plaintiffs refer to a proposal made to the directors of Equity by Milton in 1964 of a program calling for the acquisition of a partnership in return for some 1,100,000 shares of Equity common stock. It is argued this proposal demonstrates the existence of the policy. However, the proposal was never consummated primarily because the partnership was unwilling to accept in payment for its assets Equity's shares at their net asset value when those shares were selling in the market at a lesser value.

Also, plaintiffs argue that a proposal in 1965, submitted by Milton to the Equity Board, consisting of ten separate proposals all involving the use of Equity shares at underlying book value in the acquisition

of substantial interests in new ventures, establishes the existence of the policy. The fact of the matter is, however, that these proposals were rejected by the Board.

Furthermore, the 1964 and 1965 proposals by reason of the fact that they were materially subsequent to the 1963 options, may not be pointed to as establishing a corporate policy in 1963 in the absence of any showing whatsoever prior to 1963 of any such policy.

In the final analysis, if any doubt remains, we think it determinative that the shares controlled by the options in question were prior to December, 1962, admittedly either owned or controlled by Milton and that for tax reasons personal to himself, he apparently relinquished control and reacquired that control some months later. The opportunity, therefore, if indeed it can be called an opportunity, which came to Milton was of his own making, and was in reality nothing more than the reacquisition directly of property over which he formerly had exercised control indirectly. In a sense, he was a stockholder dealing with himself—a situation entirely inconsistent with the usual concept of corporate business opportunity.

If the plaintiffs are correct that the acquisition of the current options by Milton was in fact the taking of a corporate opportunity belonging to Equity, it seems to us that the argument thus made, if pushed to its logical conclusion, would have required Milton to permit Equity to acquire these shares prior to the events of 1962-1963. He, in reality, was dealing with what was his own property throughout. If it was wrong for him to reacquire direct control over it in 1962, it was wrong for him to have exercised indirect control over it prior to that time. The plaintiffs make no such argument and, indeed we think, could not.

■ We think that under the circumstances of this case there was no corporate opportunity with respect to these options. We say this because it is quite apparent that whatever opportunity existed was of Milton's own making. Throughout, he was dealing with his own property, or at least property which he controlled. Such being the case, there was in fact never any new opportunity that came into being. Since there is nothing wrong in a corporate officer owning or controlling stock of his corporation, *DuPont v. DuPont, 3 Cir.,* 256

*F.* 129, *cert. den.* 250 *U.S.* 642, 39 *S.Ct.* 492, 63 *L.Ed.* 1185, there can be no possible objection by the corporation to his holding or controlling it in whatever way he sees fit, or shifting its ownership or control as he sees fit.

Finally, it is argued by the plaintiffs that the cause is not in a proper posture for a decision on motions for summary judgment. We think to the contrary because, on the facts related above, which are not seriously disputed but which are attacked, if attacked at all, on a theoretical basis, Milton is clearly entitled to judgment. The fact that other immaterial facts are denied by the plaintiffs in their affidavits, thus making issues of fact with respect to them, makes no difference. The facts necessary for a decision in this cause are not in issue. They are undisputed and they clearly justify the conclusion that Milton has not appropriated anything for himself that in all fairness should belong to the corporation. *Johnston v. Greene, supra.* The facts and the law require the entry of judgment for the defendant.

The judgment below is affirmed.