**In the Matter of CENTURY GLOVE, INC., a Delaware corporation, Debtor.**

**Bankruptcy No. 85–438.**

United States Bankruptcy Court, District of Delaware.

May 11, 1987.

See also, Bkrtcy., 62 B.R. 693, Bkrtcy., 74 B.R. 958.

Eduard F. von Wettberg, III, P. Clarkson Collins, Jr., Morris, James, Hitchens & Williams, Wilmington, Del., for debtor.

Edmond D. Johnson, Morris, Nichols, Arsht & Tunnell, Peter J. Walsh, Bayard, Handelman & Murdoch, Wilmington, Del., for First American Bank of New York.

Gregory Cuzzolino, Newark, N.J., for U.S. Trustee's Office.

James L. Patton, Jr., Young, Conaway, Stargatt & Taylor, Wilmington, Del., for Unsecured Creditors Committee.

## MEMORANDUM OPINION AND ORDER

BALICK, Bankruptcy Judge.

Century Glove, Inc. and its subsidiary Southwest Gloves and Safety Equipment, Inc., filed Chapter 11 petitions on November 14, 1985. On December 3, 1986, First American Bank of New York (FAB) moved for the appointment of a trustee in the case of Century.

It is the third motion for the appointment of a trustee. On April 4, 1986, the U.S. Trustee moved for a conversion to Chapter 7 or the appointment of a trustee; that motion was voluntarily dismissed May 27. On May 28, Alan V. Iselin filed a motion for the appointment of a trustee accompanied by an affidavit alleging fraud, dishonesty and mismanagement by Margot and Howard Modlin regarding Margot Modlin's operation of General Glove, Inc. On July 10, this court ruled in an unrelated matter that Iselin was not a party in interest entitled to intervene in the reorganization case. Therefore, his motion was dismissed during a teleconference on July 28.

As a result of the court's concern about Iselin's charges, a stipulated order was entered August 5 directing the U.S. Trustee to appoint an examiner. An examiner was appointed but had not had time to file a report before a hearing was held September 18 on the adequacy of Century's disclosure statement. Approval of the statement was withheld pending the report of the examiner. His report was filed November 7. On November 10, Century filed objections to the report and an application re-

questing the court to set aside the examiner's findings and make its own findings of fact. As a result of a stipulated confidentiality order, the report, related pleadings and hearing were *in camera.*

The court on November 24 denied Century's application concluding that it would be a denial of due process to grant the relief requested when other interested parties had been excluded from the hearing. Century was directed to amend its disclosure statement to state the conclusions of the examiner. Century quoted the following paragraph from the court's opinion in the disclosure statement:

> The examiner did not make findings with respect to the veracity of specific allegations offered by Iselin. He viewed the allegations "in terms of their implication." The implication is that an insider willfully gained an advantage by her failure to disclose at the beginning of the bankruptcy case Century's Newark location, the existence of General Glove, Inc., and the relationship of General Glove to Century. For purposes of disclosure, the court is satisfied that in the first instance the omission was inadvertent and thereafter the failure to explain the relationship was a reflection of poor judgment. Furthermore, the record supports Margot Modlin's contentions that but for General Glove's existence, Century would not exist today.

The disclosure statement was approved as adequate on December 2 and a date set for a hearing on confirmation.

The present motion was filed the next day. Thereafter, there were motions to dismiss, a motion requesting access to the examiner's report and related documents, discovery requests and motions for protective orders. (Doc. #'s 164, 165, 166, 167, 168, 174, 178, 193, 194, 195, 196, 197, 198). The examiner's statement and all related pleadings, documents, exhibits and transcripts were removed from *in camera* status on December 30. The court in granting one of the motions for a protective order

advised counsel that the record on the examiner's report would be part of the record on FAB's motion for appointment of a trustee. (Doc. # 200, TR 1/23/87, p. 14). The hearing on the trustee motion held March 9 was followed by post-trial briefing and oral argument.

Section 1104(a), (151104(a)), of title 11, United States Code, requires a court, after notice and hearing, to appoint a trustee at any time before confirmation of a plan either for cause or if the appointment would be in the best interest of creditors, equity security holders and other interests of the estate. FAB contends cause exists and that the appointment of a trustee would be in the best interest of creditors. The U.S. Trustee supports FAB's request because he believes the appointment would be in the best interests of the estate. The creditors committee takes the opposite position and opposes the motion.

FAB asserts two broad bases in support of its request. First, Margot Modlin, Century's managing executive, breached her fiduciary duties to Century by diverting Century assets to her wholly owned company, General Glove, Inc. Second, Century's counsel, Morris, James, Hitchens and Williams (MJH & W), is not disinterested as is required under 11 U.S.C. § 327(a) in that they represent the adverse interests of Margot Modlin and her husband Howard S. Modlin and General Glove, Inc.

FAB's charges of the diversion of a corporate opportunity are based upon a series of events that happened in October and November 1985. Those events must be examined in the milieu they occurred. This requires an overview of Century's troubled existence since it was purchased from Miller Shoe Co. by a group of investors in late 1983.[1]

Howard S. Modlin, a partner in a New York law firm, and Alan V. Iselin, an executive with Miller Shoe, had established over the years a business and personal relationship through Modlin's firm's representation of Miller. When Miller decided to sell Cen-

---

1. In addition to references noted within the text, the following review of Century's history is based upon opinions filed in the Court of Chancery of Delaware as found in the record on the examiner's report.

tury, they thought it a good investment opportunity and formed a group of inves-. tors to acquire it. Modlin and Iselin also formed Tamarack, Inc. to hold their share of Century stock. Tamarack eventually acquired all but approximately a 10% interest of Century which is held by Edgehill Investments. Modlin and Iselin each held a 50% share of Tamarack's outstanding stock and together controlled Century.

Iselin and Modlin permitted Century's management under the leadership of Joseph Milot to continue. Century had recurring cash flow problems and was heavily indebted to FAB. In April 1984, Modlin and Iselin agreed that Century's operating expenses needed to be closely monitored and Iselin left his position with Miller to become CEO at a salary of $80,000. Iselin who had a long-term relationship with FAB and was a member of the Bank's advisory board was charged with keeping the Bank satisfied. (TR 11/20–21/85, at 97). Century's financial condition did not improve and Modlin and Iselin began quarreling. They agreed to implement a new management plan. Margot Modlin would be asked to serve as an unpaid consultant. Iselin would take no further salary or expenses and Modlin would handle Century's legal affairs without charge. The plan went into effect in early September 1984. Margot Modlin concluded that Century lacked a system for analyzing the relative profitability of its various segments which resulted in an inability to determine which of its product lines was responsible for its lack of working capital. During this time, Century was unable to secure a line of credit to accept $200,000 of full-fashion gloves it had contracted to purchase from mainland China. If Century defaulted, it would lose its source. Margot Modlin provided her personal line of credit to prevent a default and took an assignment of the purchase orders. In late September, another working capital problem resulted in Joe Milot's resignation. Margot Modlin was asked to undertake an expandedsupervisory role in Century's operations. She agreed to undertake these duties without compensation upon the understanding that Iselin would give her 20% of his share, 10% interest, in Tamar-

ack. Modlin also agreed to give her 10% of his Tamarack holding.

Although the relationship between Margot Modlin and Iselin was successful through October, bickering between Modlin and Iselin continued and disagreements developed between Margot Modlin and Iselin. In short, Iselin told Margot Modlin her services were no longer needed and she left in late December after Iselin reneged on his promise to transfer 20% of his Tamarack stock to her. Iselin resumed the position of CEO. Iselin and Modlin continued to feud.

When the gloves arrived from China, Iselin refused to take and sell them when Margot Modlin offered them to Century. She formed General Glove in March 1985 to receive and sell the shipment. The "work glove" part of the shipment was sold directly from the bonded warehouse at a profit but the "full-fashion" part of the shipment was unsold as of November 1, 1985.

Century's financial situation continued to deteriorate. Iselin and Modlin could not agree upon corporate policy and Century's activities were severely curtailed. Their differences led to an action in the Chancery Court of the State of Delaware for a determination of their respective holdings in Tamarack and, if equal, the appointment of a custodian to break the director deadlock. *See Modlin v. Iselin*, C.A. No. 8104 (Del. Ch.1985). Following a trial and post-trial briefing, these issues were submitted to Justice Walsh sitting in Chancery on October 23.

By letter dated October 22, FAB declared its loans to Century in default and demanded payment in full within 48 hours (TR 11/20–21/85, at 80). Iselin, by letter dated October 24, surrendered FAB's collateral. That same day, FAB's representatives began taking possession of Century and Southwest's tangible and intangible assets. Operations ceased and all employees were terminated October 25.

The opinion of the Court of Chancery dated November 1 declared Margot Modlin entitled to 20% of Iselin's share in Tamar-

ack and that any attempt by Iselin to exercise control of that stock could not be recognized. The decision resulted in Modlin and Iselin each holding 40% and Margot Modlin 20% of Tamarack. Iselin refused to waive the required 10–day notice period of a stockholders meeting. Consequently, the Modlins were unable to formally assume control of Tamarack and thus Century until November 11. (TR 11/20/85, at 40; TR 3/9/87, at 23, 112).

A trustee must be appointed if Margot Modlin diverted a corporate opportunity of Century to her wholly owned company, General, at a time when she owed a fiduciary duty to Century.

■ The obligation of undivided loyalty to the corporation precludes a fiduciary from appropriating for himself a corporate opportunity. Brodsky & Adamski, *Law of Corporate Officers and Directors*, § 4.01 (1984). The doctrine of corporate opportunity is defined in *Guth v. Loft*, 23 Del.Ch. 255, 5 A.2d 503 (Del.Supr.1939), as follows:

> If there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself.

*Id.* at 272–73, 5 A.2d at 511. Subsequent Delaware cases have rephrased the test disjunctively [2], but the Delaware Supreme Court has recently summarized the *Guth* rule as prohibiting an officer from seizing a business opportunity if: (a) the corporation is financially able to undertake it; (b) it is within the corporation's line of business; and (c) the corporation is interested in the opportunity. *Science Accessories v. Sum-*

*magraphics*, 425 A.2d 957, 963 (Del.Supr. 1980).

Whether a given opportunity satisfies these requisites is a question of fact to be determined from the objective facts and surrounding circumstances. *Equity Corp. v. Milton*, 43 Del.Ch. 160, 221 A.2d 494, 497 (Del.Supr.1966). If these elements are found to be present, the opportunity is treated as a corporate asset and the diversion of it by the corporate officer or director individually constitutes a violation of his fiduciary duty. *Borden v. Sinskey*, 530 F.2d 478, 490 (3rd Cir.1976).

The parties agree that under Delaware law, Margot Modlin stood in a fiduciary relationship to Century, its creditors and stockholders after November 11 when she became the managing executive. *Guth v. Loft, Inc.*, 23 Del.Ch. 255, 5 A.2d 503, 510 (1939).

The question exists, however, whether Margot Modlin was a corporate fiduciary of Century between November 1 and November 11. FAB contends she was a fiduciary from November 1 because the Modlins owned 60% of Tamarack stock and as a consequence were in a position to control Century. Thus, she had a fiduciary obligation to Century, its creditors and minority stockholder. In reaching its conclusion, FAB alleges that although Margot Modlin lacked record ownership of the Tamarack shares on November 1, she had beneficial ownership and the power to vote them. FAB ignores the fact that the Modlins could not vote their shares in Tamarack to gain control of Century until after November 11 in light of Iselin's refusal to waive the 10–day notice of a Tamarack shareholders' meeting. It also assumes that Margot Modlin with a 20% interest in one corporation is a controlling stockholder owing a fiduciary duty in another corporation by coupling her interest with the individual interest of her husband in the first corporation. FAB presents no authority in support of its theory that an individual minori-

---

**2.** *E.g., Equity Corporation v. Milton*, 43 Del.Ch. 160, 221 A.2d 494 (1966) (*Guth* provides that if the opportunity is one "which the corporation is financially able to undertake, and which, by its nature, falls into the line of the corporation's

business and is of practical advantage to it, *or* is an opportunity in which the corporation has an actual or expectant interest . . .," the officer may not take the opportunity for himself). *Id.* 221 A.2d at 497.

ty stockholder may be considered a controlling stockholder and owe a fiduciary duty to the corporation simply because his or her spouse owns stock in sufficient amount that together they own a controlling number of shares. In addition, no Delaware case has been presented which addresses the issue of whether a fiduciary duty is owed by an individual to a corporation when the individual is a non-controlling shareholder who takes actions that affect another corporation without being one of its directors or officers. These are issues that should be resolved in the state courts. Their resolution, however, is not essential to the determination of this motion.

Assuming *arguendo*, that Margot Modlin owed a fiduciary duty to Century, she did not breach that duty between November 1 and November 11 nor since then. A careful examination of the facts and circumstances surrounding this case reveal that a corporate opportunity was not diverted. Two of the three elements of the *Guth* rule are not present, financial ability and the corporation's interest in the opportunity.

 Looking at the facts, it is undisputed that on October 22, 1985, FAB declared its loans to Century in default and demanded immediate repayment. In response, Iselin by letter dated October 24 surrendered to FAB all of its collateral. FAB representatives took possession of the inventory located at Century's Newark, New Jersey sales office on that day and went into possession of its manufacturing and warehousing facilities. The next day, Iselin terminated the employment of Mary Seiler and Rose Bozzo, the two women who sold gloves for Century from the Newark location. FAB closed Century's manufacturing plant in Georgia and the employees there were also terminated on October 25. The employees working in Lakeville, Connecticut were also terminated and the telephones there were disconnected. Using the language of Vice Chancellor Jacobs, Iselin had "effectively walked away." *Modlin v. Iselin*, C.A. No. 8104 (Del.Ch. June 5, 1986 Dec. on Iselin's Motion for Revision of 11–1–85 Dec. at 12) [Available on WESTLAW, DE–CS database].

It is also undisputed that as of October 25, only one of Century's telephone lines known to customers remained operating. That line was located at the Newark office. It is also undisputed that Century was in arrears in its rent of the Newark office and that it was padlocked on November 1 when the landlord informed Margot Modlin the rent was in default and he was prepared to lease the premises to Protective Industrial Products, a competitor of Century under Joseph Milot's operation. Margot Modlin also learned that the charges for the Newark telephone had not been paid. Mary Seiler and Rose Bozzo had received job offers from Joseph Milot to work for a company, Cabaret Glove, which he proposed to form to compete with Century if it came back into the market but being dissatisfied with Milot's deal, they worked for him only one day during the week of October 28.

Margot Modlin made a conscious decision on November 4 to use General as a vehicle to save Century. She met with Seiler and Bozzo to discuss their possible employment by General. Also, on November 4, General rented the Newark office by making a payment to the landlord that brought Century's rent payments current. Seiler and Bozzo who had been offered jobs by Tri-Land Manufacturing refused to work for Century and agreed to join General on November 5, only after they had been assured their jobs were protected from the financial uncertainties surrounding Century and from Iselin who they considered treated them unfairly. They began answering the telephone in Newark on behalf of both Century and General. General paid Century's overdue telephone bill on November 12.

The record clearly demonstrates that in October and November of 1985, Century was financially incapable of retaining its telephone number, recapturing its leasehold, or recovering its former employees or the full-fashion business. Its only funds were $13.16 found in a drawer; FAB had all of its inventory, including unsecured inventory, as well as its bank accounts, accounts receivable, real estate, machinery

and equipment; it had no employees, and it was in arrears in its rent and telephone bill.

In its opening brief, FAB alleges "Century needed only ten days breathing room before the filing in bankruptcy and the automatic stay would have preserved these opportunities for Century and made it possible for Century to assume them on its own behalf." FAB engages in speculation as to what would have happened using the aid of hindsight. The decision to file bankruptcy was not made until November 13. The decision to use General to aid Century was made November 4. Uncontradicted testimony revealed that Century's reputation was already declining at the time General reopened the Newark office because Century had failed to deliver orders as promised. An additional ten days may have been a sufficient time of uncertainty to ruin Century's reputation in the glove industry. The testimony in this case has demonstrated that it is very important in the glove business to maintain contact with and satisfy customers.

Despite Century's lack of funds, FAB proposes:

1. Century could have sold its full-fashion glove business to a third party; or

2. Century could have used its full-fashion orders and good will to reenter the full-fashion glove business.

■ FAB's first proposal is again sheer speculation. There is no evidence in the record that demonstrates any definite interest by third parties to purchase Century's full-fashion glove business. FAB cites as support for a prospective purchase a previous buy-out offer made in 1985 for Southwest Gloves and Safety Equipment, Inc., Century's Texas subsidiary. FAB is comparing apples and oranges. Southwest Glove is a distributor which buys and sells merchandise and stores inventory in a warehouse. It is not a manufacturing concern with a sales office such as Century. The two operations are totally different.

FAB also cites Howard Modlin's attempt to obtain Century's full-fashion business in 1985 as an example of the marketability of the business. This example is taken out of context. Modlin's "attempt" was an offer made during the course of settlement negotiations with Iselin and therefore is inapposite. *See* TR 11/13/86, at 205.

Additionally, FAB suggests that Milot's attempt to purchase Century's full-fashion operation in mid–1985 demonstrates there was a market if Century had wanted to sell. Milot's willingness to purchase Century's full-fashion business is not necessarily demonstrative of the interest of other companies in the glove industry. Milot is a competitor with Century in areas other than full-fashion gloves, and the record shows attempts by Milot to take over some of those other parts of Century. Additionally, no testimony has been presented to evidence that such proposal amounted to anything more than a discussion. Again, FAB is using hindsight to speculate as to what an optimal solution may have been.

■ With regard to the second proposal, the record, as earlier stated, does not support Century being able to reenter the full-fashion business in November 1985; nor does it support Century's ability to reenter the business now. Century's good will in November 1985 was questionable. It was a company with severe financial troubles. It was not delivering orders as promised, its reputation was faltering, and it was unable to obtain favorable credit terms. It could not take advantage of a China quota as that had lapsed in December 1984 when Century did not pick up the second letter of credit. It did not have the full-fashion gloves shipped as a result of Margot Modlin's volunteering her personal line of credit when Century would have defaulted since it had refused to take them. The record is not clear, but it is questionable whether Century even had the financial resources to secure the second letter of credit or to pay Margot Modlin for the first shipment of gloves.

Not having a China quota, Century's only access to full-fashion gloves would be domestic middlemen. This source reduces the amount of potential profit. In addition, the full-fashion glove market is a limited market as compared to that of work gloves

and represented only 3% of sales when Century had the advantage of a China quota.

Furthermore, a substantial amount of working capital is necessary to support entrance into the full-fashion business. According to expert testimony, approximately $100,000 is needed to generate $360,000 of annual full-fashion sales in a company such as General. This figure is an approximation using industry standards listed in sources such as Dun and Bradstreet and Robert Morris Associates. It is not certain whether such standards take into account the fact that a company may be in bankruptcy and may have a faltering reputation. But even if Century could have reentered or can now reenter the full-fashion business with $100,000, Century did not have any funds in November 1985 and it does not have $100,000 today.

FAB suggests that through the exercise of more care in its inventory control, Century would have had $67,000 of working capital available in May 1986 to use in the full-fashion business, and by the end of June 1986 it would have had another $79,-000, or a total of $146,000 available to commit to full-fashion gloves. Again, FAB is engaging in speculation.

Several factors must be considered in determining whether Century is carrying too much inventory ...

First, in order to continue providing adequate protection of FAB's collateral a significant portion of Century's inventory/accounts receivable must be maintained to satisfy the replacement lien granted to FAB by the court in its decision of April 17, 1986.

Second, Century must maintain a substantial level of inventory in order to meet the demands of its customers. It is undisputed that gloves must be manufactured in advance of customer demand and projections of future demand are necessarily subject to some degree of error. All of these factors contribute to some unexpected accumulation of inventory.

Therefore, FAB's two proposals do not support its contention that Century had or has the financial ability to go back into the full-fashion aspect of the glove industry. Furthermore, the decision to use General provided many benefits for Century. By paying the rent, telephone bill, and Seiler and Bozzo's salaries, General provided a way by which Century could keep in contact with its customers. The telephone listing was and still remains in Century's name. The glove industry is very competitive. If a customer cannot obtain what he needs from one manufacturer/distributor, he can easily find another who will satisfy his needs. Although Century could not fill orders immediately upon General's reopening of Century's Newark office, General was able to fill full-fashion orders from the stock Century had refused to take under Iselin. Seiler and Bozzo were able to provide information and later assurances regarding Century. Seiler and Bozzo aided customers in obtaining their domestic glove needs while Century's inventory was in FAB's possession so that the customers would call again.

After Century filed bankruptcy, was granted the use of cash collateral, and later resumed manufacturing gloves, General continued to provide and still does provide many benefits for Century. It is undisputed that until March 1986, Seiler and Bozzo were Century's only sales persons. Although they were and continue to be paid by General, Seiler and Bozzo, pursuant to instructions from Margot Modlin, devote the majority of their efforts to selling gloves for Century. The Newark telephone is answered "sales". Seiler and Bozzo take the caller's order whether it be for Century or General. Century fills the domestic glove orders and General fills the full-fashion orders. General continues to pay the rent, the telephone bill, and Seiler and Bozzo's salaries. Margot Modlin has received no compensation from Century and states she has no intention to file on behalf of General a claim for reimbursement if Century is successful in its reorganization effort.

General provided a vehicle whereby Century was able to recover approximately 75% of its customers and position itself as a domestic manufacturer. Undisputed testi-

mony reveals that Century's reputation is now improving and that it must conserve its resources to regain its position in the "work-glove" industry.

■ Despite Century's financial inability and benefits conferred to it by General, FAB contends that Margot Modlin cannot retain opportunities for General and justify doing so by asserting Century's financial inability to assume them, citing as authority *Borden v. Sinskey*, 530 F.2d 478 (3rd Cir.1976). FAB's reliance on *Borden* is misplaced. It is authority for finding an exception only where the facts warrant. The facts of this case when compared with the *Borden* case fall far short of a basis for deviating from the *Guth* rule.

■ Furthermore, there is nothing in the record to support the third part of the *Guth* rule, that is, Century has or even should have an interest in going into the full-fashion business, especially in light of its insignificant percentage of sales in Century's last good year and its decision not to or its inability to find a means of maintaining its China quota and its refusal to accept Margot Modlin's gloves in early 1985.

FAB's second basis for the appointment of a trustee is the allegedly conflicting interests of Century's counsel in representing not only Century but also Margot Modlin and Howard S. Modlin individually and General Glove. Even if there were a conflict, the suggested remedy is not appropriate.

■ The appointment of a trustee imposes substantial financial burdens on a debtor's estate which can preclude the possibility of reorganization. *In re Crescent Beach Inn, Inc.*, 22 B.R. 155 (Bankr.Me. 1982). None of the cases cited by FAB is authority for the appointment of a trustee because a debtor's counsel was found to have a conflict of interest. There is no basis for resorting to the trustee remedy to resolve attorney conflict issues.

In closely held corporation cases, the appearance of a conflict is difficult to avoid when as here the designated officer representing the corporation's interest has an interest other than as managing executive of the corporation. The attorney representing the corporation necessarily must deal with the individual in his capacity as an officer.

■ If as a consequence of representing the debtor, a benefit accrues to the corporation and also appears to benefit the individual, a charge of conflict based on that appearance is not justified. It is obvious that MJH & W could not represent Century's interest unless Margot Modlin was an active participant.

■ FAB's claim of a lack of disinterestedness dates back to MJH & W's representation of the Modlins in the Chancery Court action. That action did not involve any interest adverse to Century's estate. The Court's decision in that action broke a deadlock which could have resulted in Century's demise. Century is still alive 16 months later. Moreover, since FAB was actively involved in this case soon after its filing, its failure to raise this issue in a context other than as an objection to an interim fee application in July 1986 and now a motion for the appointment of a trustee renders it estopped. As to any alleged charge of conflicts arising after the filing of the petition, the court at the hearing on the interim fee application commented that it had noted no improprieties, that it was troubled by the raising of such an allegation and suggested that if there was any basis to the charge, there was an appropriate way to deal with it. (TR 7/10/86, p. 74). Implicit in that statement is the appropriate time to deal with it. That time has passed insofar as FAB asserts any improprieties preceeding the trustee motion.

■ Century's request that it be awarded the costs of defending against this motion must be denied. Century has not demonstrated that FAB violated Fed.R.Civ.P. 11 BR 9011 or 28 U.S.C. § 1927.

BR 9011 tracks the text of Fed.R.Civ.P. 11, with slight modifications as are necessary in bankruptcy matters. The rule, through its amendments adopted in 1983, is designed to discourage in bankruptcy proceedings the same type of conduct which

Fed.R.Civ.P. 11 proscribes. *Cinema Service Corp. v. Edbee Corp.*, 774 F.2d 584 (3rd Cir.1985). As stated succinctly by the Second Circuit Court of Appeals in *Eastway Construction Corp. v. City of New York*, the language of Fed.R.Civ.P. 11 "explicitly and unambiguously imposes an affirmative duty on each attorney to conduct a reasonable inquiry into the viability of a pleading before it is signed. Simply put, subjective good faith no longer provides the safe harbor it once did." 762 F.2d 243, 253 (2nd Cir.1985).

FAB has met the standards mandated by Fed.R.Civ.P. 11 and BR 9011. It is evident that FAB's motion and subsequent memoranda involved much thought, research, and legal analysis. Reasonable arguments based on the perceived facts of the case were well presented and supported by legal authorities. As previously stated the facts, as the court believes them to be, do not warrant the appointment of a trustee. This conclusion, however, does not preclude FAB's counsel from having had a reasonable belief at the time of filing the motion that the motion was well grounded in fact and warranted by existing law. When FAB filed the motion, it did not have access to the record on the examiner's report. The court's order authorizing access to that record was entered December 30, 1986.

In addition, Century's present request for costs and attorneys' fees on the grounds that FAB violated Fed.R.Civ.P. 11 and BR 9011 is in conflict with its earlier position of opposing investigative efforts by FAB relating to this motion, *e.g.*, Century's opposition to FAB's request for access to examiner's record (Doc. # 164 and # 168, TR 11/13/87) and FAB's discovery attempts (motion for protective order re: deposition of Modlin (Doc. # 165) and request for production (Doc. # 166)).

Furthermore, for the reasons stated above, FAB has not violated 28 U.S.C. § 1927. FAB's motion and subsequent memoranda demonstrate that it had a reasonable belief that appointment of a trustee was necessary, and it did not file the motion simply to multiply the proceedings.

For all of the above reasons, the motion of FAB, supported by the U.S. Trustee, for the appointment of a trustee must be denied and the request of MJH & W for an award of costs, including legal fees, must be denied. An order is attached.