BROMWELL AULT, Respondent-Appellant, v JOHN D. SOUTTER et al., Appellants-Respondents.

First Department, May 16, 1991

## APPEARANCES OF COUNSEL

*Lewis S. Sandler* of counsel *(Beigel & Sandler,* attorneys), for respondent-appellant.

*Elihu Inselbuch* of counsel *(Peter Van N. Lockwood* and *Jill R. Shellow* with him on the brief; *Caplin & Drysdale,* attorneys), for appellants-respondents.

## OPINION OF THE COURT

MILONAS, J. P.

This action concerns various transactions that were carried out by defendant John D. Soutter in connection with his position as one of the directors and chief executive officers of defendant Inverness Management Corporation, a Delaware company whose only office was in New York. It is undisputed that the instant matter is subject to Delaware law.

Inverness was in the business of providing certain financial and travel services for its clients but suffered considerable losses over the years. Therefore, some of its clients became shareholders in exchange for either capital contributions or loans to the corporation. By 1985, the company had essentially turned into a holding company for two subsidiaries, a fish food producer known as Moore Clark Co. and a travel agency called Inverness Travel, with Soutter being its only employee. Most of the approximately 30 stockholders of Inverness were, after years of financial reverses and internal strife, eager to dispose of their shares and disassociate themselves from the corporation. By December 31, 1985, there were outstanding 313,560 shares of common stock and 4,534 shares of series A and B preferred stock, the latter redeemable at the company's option at $1,000 per share. On that date, the board of directors consisted of Soutter, defendant Ambrose Monell, one Garrick Stephenson and plaintiff Bromwell Ault; Monell was the only member of the group who did not own any stock in Inverness. Stephenson, in contrast, possessed 134,797 common shares which he wished to sell in order to sever his relationship with the corporation but there was no secondary market for the stock.

The directors of Inverness had engaged in discussions concerning the possibility of having the company purchase Stephenson's shares with the proceeds of the sale of its assets. However, on December 31, 1985, Soutter, without advising the other directors, agreed to buy Stephenson's block for $7 per share, amounting to a total of nearly $1 million, $100,000 of which was to be paid on January 15, 1986 and the remainder on July 1, 1986. Stephenson promptly resigned his position on the board. Soutter borrowed the $100,000 installment from

Citizen Fidelity Bank in Louisville, Kentucky, so that he could meet the first payment. He thus owned 57% of the corporation's stock. Then, on February 25, 1986, Soutter, on behalf of Inverness, executed a letter of intent to sell the fish product subsidiary, which deal closed in April of that year, according to which Inverness was to receive in excess of $3,600,000 cash plus the right to procure $300,000 for each of the ensuing five years if certain targets were achieved. These goals were subsequently reached, and Inverness ultimately obtained $5,500,000 on the sale.

The obligation to Stephenson was coming due, and, once again, Soutter failed to consult his fellow directors prior to embarking upon his next transaction. Thus, he pledged his 57% interest in Inverness common stock as collateral for a $943,579 loan from United States Trust Company. This enabled Soutter to pay Stephenson the balance which he still owed the latter, as well as permitting Soutter to repay the $100,000 previously borrowed. In addition, he induced the other directors to approve the transfer of Inverness funds to United States Trust without disclosing his arrangement with the bank. Soutter thereafter proceeded to form a corporation owned by himself, defendant Pelican Corporation, and shifted his Inverness stock to the new company. In the meantime, as majority stockholder of Inverness, Soutter, this time with the concurrence of the board, caused Inverness to purchase all of its preferred stock at $250 per share. Although most of the eligible shareholders snatched at the opportunity to unload their stock, plaintiff was one of the few who elected not to tender their holdings. In any event, the result was a payout of more than $1 million of Inverness assets. Soutter then retired almost all of the common stock at $7 per share, again neglecting to submit the matter to the consideration of the board. By eliminating a block of outstanding common stock, Soutter's portion of the shares increased to more than 80%.

On October 8, 1986, he made his next move when he devoted nearly $1 million of Inverness money to pay off his personal loan from United States Trust. Predictably, he did not notify plaintiff of this action nor did he seek a vote from the directors. Soutter and Monell both testified at trial that Monell had been informed of the arrangement; plaintiff, on the other hand, stated that Soutter later claimed that he had simply forgotten to tell him. Yet, at the time that Inverness corporate funds were expended in such a manner, there was no written documentation of the transaction as a loan.

Plaintiff resigned from the board on December 3, 1986 after he learned of Soutter's latest maneuver. Not until plaintiff persisted in threatening to initiate litigation did Soutter formally record the payback as a loan to Pelican at 8% interest. In that regard, Soutter executed a back-dated promissory note in favor of Inverness. Since Pelican's only asset was its Inverness shares, Inverness, in effect, had no security at all, creating a financial arrangement which was hardly to Inverness' benefit. Moreover, Soutter continued to have Inverness purchase additional common stock at $7 per share until Soutter-Pelican owned some 90% of Inverness.

In November of 1987, Soutter established defendant Ptarmigan of Delaware Corporation, a Delaware corporation, as a wholly owned subsidiary of Pelican and proposed a freezeout merger of Ptarmigan into Inverness pursuant to sections 228 and 251 of the Delaware General Corporation Law (Del Code Annot tit 8). This left minority shareholders with the choice of either obtaining $12 per share or requesting an appraisal under Delaware General Corporation Law § 262. The few remaining preferred stockholders were removed by means of Soutter's exercise of Inverness' option to redeem their holdings at $1,000 per share. Although plaintiff purported to reserve his right to seek an appraisal, he did not institute such a proceeding. It should also be noted that while he had not been consulted with respect to most of Soutter's actions, he had been cognizant of the latter's efforts to assume control of Inverness stock. However, the instant derivative action represents plaintiff's first attempt at invoking legal process in response to Soutter's tactics.

The amended complaint alleged five causes of action as follows: (1) that Soutter's acquisition of the outstanding common stock of Inverness, particularly those purchased from Stephenson, by means of Inverness' own cash constituted a conversion of the corporation's assets and a violation of his fiduciary duties to plaintiff and other shareholders; (2) that Soutter's and/or Pelican's purported borrowing from Inverness for the purpose of repaying the loan to United States Trust involved a theft and conversion of Inverness' assets; (3) that Soutter's conduct amounted to a fraud against Inverness; (4) that Soutter and the other defendants have, since December of 1985, failed to inform the other shareholders of Inverness' business, finances, prospects or operations and have managed Inverness for their own personal gain and profit, in a manner wasteful of Inverness' assets and in total disregard

of the rights of the minority shareholders, and they should, therefore, be compelled to account for their operation of Inverness, and a receiver should be appointed to secure the assets of Inverness and operate its business; and (5) the merger of Ptarmigan into Inverness was accomplished improperly and solely for the benefit of Soutter and is, accordingly, contrary to the interest of Inverness and its minority stockholders. Defendants, in response, denied plaintiff's various claims and asserted five affirmative defenses, including his lack of standing, his ratification and approval of defendants' acts, his failure to adequately represent the other shareholders and laches.

At the conclusion of the nonjury trial held in this matter, the court, in a thorough and well-reasoned opinion, found in favor of plaintiff. First, the Judge determined that this case was analogous to *Guth v Loft, Inc.* (23 Del Ch 255, 5 A2d 503 [Sup Ct 1939]) in that Soutter had employed his position to benefit himself rather than providing the corporation with the chance to acquire Stephenson's shares. In the view of the Supreme Court herein: "If there is a corporate opportunity which would be financially advantageous to the corporation, an officer or director cannot take the opportunity for himself; if the interests of the corporation are betrayed, a constructive trust may be declared (Borden v. Sinskey, 530 F.2d 478 [3 Cir. 1978]). Even where the corporation does not immediately have the financial resources to take advantage of the opportunity, the officer or director has a good faith obligation of fair dealing and full disclosure of facts, so that the corporation can attempt to find some viable method of exercising the opportunity".

While the court acknowledged that Inverness did not possess sufficient cash to purchase Stephenson's stock until after it had sold its Moore Clark subsidiary, it observed that the preferred shareholders had liquidation preferences which needed to be satisfied before Inverness could buy back its own common stock. The Judge further commented that: "However, even in December 1985 it was well known that a sale of Moore-Clark was imminent and would provide substantial funds for Inverness. Moreover, even at that time, there was a realistic chance that the preferred shareholders * * * would accept substantially less than $1000 per share in order to take at least some cash out of their investments. Once the corporation subsequently offered $250 per share, the overwhelming majority (over 90 percent) of the preferred shares were ten-

dered back to the corporation. Once Inverness had the cash (from the Moore-Clark sale) and the large majority of preferred shares had been retired, the corporation legally could have purchased Stephenson shares for the benefit of all remaining shareholders of Inverness. There is no reason why the corporation could not have offered Stephenson an executory contract under which Inverness would pay Stephenson $7 per common share, *subject to* the sale of Moore-Clark and the retirement of a sufficient number of preferred shares."

The court rejected defendants' contention that there was no assurance that Stephenson would have accepted a contingent contract, noting that considering the very limited market for the shares, he would not have been in a strong bargaining position and that, at any rate, Soutter did not possess the funds necessary to procure Stephenson's stock either and ultimately did so by spending corporate assets. The court, moreover, was highly critical of Inverness' loan of nearly $1 million to Soutter's Pelican Corporation, characterizing it as an egregious conflict of interest in violation of Delaware General Corporation Law §§ 143 and 144 on the grounds that it lacked the approval of a majority of the board of directors or of the shareholders and was unfair to the corporation since other viable investment alternatives were never seriously explored.

In discussing defendants' argument that after the merger had occurred, plaintiff lost his standing to maintain a derivative suit, the Trial Judge relied upon an exception in Delaware to the no-standing rule wherein the merger itself was the product of fraud, citing *Lewis v Anderson* (477 A2d 1040) and *Cede & Co. v Technicolor, Inc.* (542 A2d 1182). In that regard, the court concluded that even if the merger documents themselves did not contain false representations, the method by which Soutter obtained a sufficient number of shares to effectuate the freezeout merger clearly constituted fraud and/or breach of trust. "Essentially", the court declared, "Soutter tried to take over 100 percent of Inverness without spending hardly a cent of his own money." Accordingly, the court held that the appropriate remedy was to set aside the freezeout merger, establish a constructive trust for the benefit of Inverness and all of its shareholders, restore plaintiff and other minority shareholders to their prior status, and offer stockholders the right to reacquire their shares at the price paid for them.

Defendants have appealed, urging that Soutter did not

misappropriate a corporate opportunity by purchasing Stephenson's stock, that the loan from Inverness to Pelican was not in violation of a fiduciary duty, that there is no basis for awarding rescission to persons who voluntarily sold their Inverness shares prior to the merger and that, since the merger of Ptarmigan into Inverness was in all respects valid, plaintiff is without standing to pursue his derivative claims.

■ In cross-appealing, plaintiff complains that the trial court erred in failing expressly to mandate that defendants account to Inverness and its shareholders for Soutter's various financial dealings. He asserts that Soutter has been Inverness' sole employee since December 31, 1985 and during a period that the corporation realized at least $5.5 million. Of that amount, less than $2 million was expended to retire the corporation's common and preferred stock and another million or so was applied to repaying Soutter's personal loan, leaving approximately $2.5 million unaccounted for. Indeed, an examination of the record herein reveals a pattern of improper conduct on the part of Soutter in which he appears to have enriched himself without risking his own money and at the expense both of Inverness and its other shareholders. Thus, there is no indication anywhere that Soutter ever spared a stray thought to the interests of the corporation which he was responsible for managing or the stockholders to whom he had a fiduciary duty.

■ Delaware law authorizes an officer or director to purchase the stock of the corporation with which he or she is associated except where the company involved has a policy of reacquiring its own stock, the director or officer takes advantage of superior or insider information or wrongly applies corporate resources to facilitate the purchase (*Field v Allyn,* 457 A2d 1089, *affd* 467 A2d 1274; *Equity Corp. v Milton,* 43 Del Ch 160, 221 A2d 494). Clearly, in the present situation, Soutter utilized Inverness' assets to purchase Stephenson's block of shares and, in fact, embarked upon all of his other transactions without seeming to spend a dollar of his personal money. As the Supreme Court correctly pointed out, in December of 1985 Soutter could not, any more than Inverness, afford to purchase Stephenson's stock but the opportunity, when it finally materialized, arose out of the sale of the corporation's fish product subsidiary and, therefore, belonged exclusively to Inverness. In *Equity Corp. v Milton (supra),* the Delaware Supreme Court, in reaffirming its prior ruling in *Guth v Loft, Inc. (supra)* stated *(supra,* 43 Del Ch, at 164, 221

A2d, at 497): "The rule of the *Guth* case is that when there is presented to a corporate officer a business opportunity which the corporation is financially able to undertake, and which, by its nature, falls into the line of the corporation's business and is of practical advantage to it, or is an opportunity in which the corporation has an actual or expectant interest, the officer is prohibited from permitting his self-interest to be brought into conflict with the corporation's interest and may not take the opportunity for himself."

■ There is, similarly, no merit to defendants' contention that plaintiff lacks standing to maintain this derivative action and that his remedy should have been limited to a statutory appraisal proceeding. In *Youngman v Tahmoush* (457 A2d 376), the court therein explained that the only standing requirement for maintaining a derivative suit is that plaintiff be a stockholder of the corporation at the time of the transaction(s) in question and that he or she is qualified to serve in a fiduciary capacity as a representative of a class. Contrary to defendants' perception of a conflict of interest between plaintiff and the other minority shareholders, their argument is derived from the fact that the other stockholders were evidently so intent on escaping with any part of their investment intact and removing themselves from the tangled affairs of Inverness that they grabbed at whatever share price was offered them, never registering any known objection. Yet, this may only signify that plaintiff was more willing than they to forego the immediate recovery of some of his investment in order to challenge Soutter's stratagems. Moreover, the fact that plaintiff was aware of Soutter's stock acquisitions or could have commenced legal action earlier than he actually did certainly does not preclude the instant litigation. Finally, the Supreme Court appropriately refused to permit defendants to rely upon the improperly effectuated freezeout merger as a mechanism for undermining plaintiff's right to institute a derivative action, correctly finding applicable Delaware's fraud-in-the-merger doctrine *(see, Cede & Co. v Technicolor, Inc., supra; Rabkin v Hunt Chem. Corp.,* 498 A2d 1099).

■ Although one may be impressed with Soutter's creative business dealings, they nonetheless plainly violated his fiduciary responsibility to Inverness and the minority shareholders and, especially disturbing, were accomplished through the conversion of corporate assets. Accordingly, in addition to the remedies already ordered by the Supreme Court, an impartial receiver should have been appointed in order to cause to be

performed an accounting of all of the profits and benefits to defendants as a result of the disputed transactions and otherwise to implement the court's directives.

Consequently, the judgment of the Supreme Court, New York County (Carol E. Huff, J.), entered on or about August 1, 1990, which, following a bench trial, found in favor of plaintiff and (1) set aside the merger between defendants Inverness Corporation and Ptarmigan of Delaware Corporation, (2) directed that the common shares of Inverness purchased from Garrick C. Stephenson be deemed to be held in a constructive trust for the benefit of Inverness and its shareholders, (3) directed that within 120 days of the date of the judgment defendant John D. Soutter advise in writing all of those shareholders who sold their common shares of Inverness after December 31, 1985 of their right to reacquire their shares at the price paid to them, and (4) directed that plaintiff and the other minority shareholders who owned common shares of Inverness in December of 1987 and who did not accept the $12 per share tendered by Inverness for such shares are to be restored to their status as shareholders, should be modified on the law, the facts, and in the exercise of discretion, to the extent of directing that the court appoint an impartial receiver who will cause an accounting to be conducted to ascertain the profits or benefits to defendants as a result of the transactions which are the subject of this action and to generally implement the directives of the court, with leave to plaintiff to further apply to the Supreme Court at an appropriate time for the receiver to manage the business operations of defendant corporations, and otherwise affirmed, without costs or disbursements.

ELLERIN, WALLACH, KASSAL and SMITH, JJ., concur.

Judgment, Supreme Court, New York County, entered on or about August 1, 1990, modified on the law, the facts, and in the exercise of discretion, to the extent of directing that the court appoint an impartial receiver who will cause an accounting to be conducted to ascertain the profits or benefits to defendants as a result of the transactions which are the subject of this action and to generally implement the directives of the court, with leave to plaintiff to further apply to the Supreme Court at an appropriate time for the receiver to manage the business operations of defendant corporations, and otherwise affirmed, without costs or disbursements.